J-A17034-18
J-A17035-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN THE INTEREST OF: D.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.L., NATURAL MOTHER | : | No. 1862 WDA 2017 |

Appeal from the Order Entered December 6, 2017
in the Court of Common Pleas of McKean County
Civil Division at No(s): No. 18 DP 2017

| IN THE INTEREST OF: D.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.L., NATURAL FATHER | : | No. 1903 WDA 2017 |

Appeal from the Order Entered December 6, 2017
in the Court of Common Pleas of McKean County
Civil Division at No(s): No. D.P. of 2017

BEFORE: OTT, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: FILED DECEMBER 26, 2018

L.L. ("Mother") and S.L. ("Father") filed separate appeals from the Order

adjudicating their daughter, D.S. ("Child"), dependent.[1] See 42 Pa.C.S.A.

§ 6301 et seq. We affirm.

_____

[1] The Order adjudicating Child dependent was initially entered on November 17, 2017. However, the trial court vacated that Order due to an error regarding Mother's name, and reentered a new Order with the corrected name on December 6, 2017. We have changed the captions to reflect this new Order.

Child was born in February 2017. At the time of Child's birth, Mother and Father were separated, and Mother resided with her paramour, J.F. As a result, despite believing Father to be Child's biological father, Mother listed J.F. as Child's father on Child's birth certificate.[2] Thereafter, Mother and Father reconciled and began to live together.

On February 22, 2017, after Child was born, McKean County Children & Youth Services ("CYS") filed an Application for Emergency Custody of Child ("the Application"). The Application alleged that (1) CYS already had custody of two of Mother's children (one of the children, C.L., was the biological son of Father);[3] (2) Mother had failed to participate in court-ordered counseling; (3) Mother did not consistently visit her children; (4) Mother had not undergone a mental health evaluation; and (5) CYS had concerns about Mother's ability to care for a newborn. The trial court granted the Application and placed Child at Love Foster Home. On February 23, 2017, CYS filed an Amended Application for Emergency Custody after learning that Father was Child's biological father. Thereafter, CYS filed a Dependency Petition. On March 3, 2017, following a hearing on the Amended Application for Emergency Custody,

_____

[2] A subsequent paternity test confirmed Father was Child's biological father.

[3] In March 2016, two children, including C.L., were removed from the home of Mother and Father. Prior to removal, the children were routinely confined to their bedroom for extended periods. The children were not toilet trained, and would smear their own feces on the walls and floor of the bedroom. The children were also observed suspended from the second floor window of the bedroom. C.L. was subsequently adjudicated dependent.

the trial court granted temporary custody of Child to CYS, pending a hearing on the Dependency Petition. Following a series of continuances, the trial court held hearings on the Dependency Petition on October 16 and 31, 2017.

At the hearing, Abbie Geist ("Geist"), a CYS caseworker, testified that CYS was involved with Mother and Father prior to Child's birth. N.T., 10/16/17, at 8. Geist stated that Mother was residing with J.F. at the time of Child's birth. Id. at 9. CYS removed Child immediately following her birth. Id. at 12, 22; see also N.T., 10/31/17, at 7-8 (wherein CYS caseworker Megan Mesler stated that Child was taken into CYS custody immediately after her birth). Geist stated that Mother and Father participated in weekly visits with Child following her birth. N.T., 10/16/17, at 15. Geist indicated that Mother had to fulfill several requirements, including working with services provided by Parents and Children Together ("PCIT") and Parents as Teachers ("PAT"), to regain custody of Child. Id. at 22, 24; see also id. at 26 (noting that Father had completed the PCIT program). Geist also stated that she observed Mother driving a vehicle, despite the fact that Mother suffered from seizures and did not have a driver's license. Id. at 16, 17-19.

CYS Case Aide Chelsie Lekanka ("Lekanka") stated that during visits, Mother and Father would place Child in a swing or on a blanket, and often would play on their phones. Id. at 27, 30, 33, 34, 35-36, 40-41. Lekanka indicated that if Child woke up in the swing, she would have to get Child. Id. at 34. Lekanka stated that she would have to prompt Mother to change Child's

- 3 -

diaper. Id. at 30-31. Lekanka testified that Mother and Father would give Child Tylenol without checking her temperature, and when Child would spit up, Mother and Father would only respond to the situation on occasion. Id. at 33, 34, 38. Lekanka did not observe Father change any diapers, and he only fed Child a few times. Id. at 50. Lekanka also indicated that both Mother and Father would leave Child in CYS's care during visits to smoke cigarettes together. Id. at 34-35, 36, 56. Lekanka stated that during visits including Child and a sibling, Mother and Father have difficulty dealing with two children together. Id. at 47. Lekanka testified that Mother did not apply any lessons learned from the PAT sessions to caring for Child. Id. at 33. However, Lekanka testified that the parenting skills of Mother and Father have improved over time. Id. at 46. Lekanka stated that Mother and Father's home is usually clean, but that they appeared to smoke indoors when CYS was not present, and on one occasion, Father ignored cat feces on the ground while cleaning. Id. at 28, 29, 44, 46-47.

CYS Case Aide Rachel Forman ("Foreman") testified that she has been working with Mother and Father for approximately two years. Id. at 59. Foreman indicated that there was little interaction between Mother and Father and Child during the visits, and that Child would be placed in a swing for long periods of time. Id. at 60, 68-69, 81-82. Foreman also noted that Mother and Father would smoke cigarettes together during visits. Id. at 70-71. Forman testified that Mother and Father have numerous cats in the home, and

that she observed fleas on the cats. Id. at 61-62, 74, 79; see also id. at 62 (noting C.L. had flea bites). However, Foreman indicated that the home was clean. Id. at 80. Foreman further testified that Mother and Father failed to apply skills learned at PAT to caring for Child. Id. at 65-66.

PCIT instructor Janine Tyler ("Tyler") testified that PCIT is a specialized therapy program for children between the age of two and seven, and their parents. Id. at 87-88, 90-91, 101-02. Tyler stated that while Father completed the program in May 2017, Mother only began to participate in April 2017. Id. at 91, 92, 99; see also id. at 111 (noting Father had completed the program with regard to C.L.). Tyler stated that between April and June 2017, Mother missed five appointments. Id. at 92-94, 105. Tyler indicated that Mother's absences and failure to respond to letters from PCIT resulted in her case being closed. Id. at 95, 106. Eventually, Father, responding on behalf of Mother, scheduled an appointment with PCIT for Mother. Id. at 96-97. However, Mother cancelled the appointment, and cancelled the rescheduled appointments. Id. at 97-98. Tyler noted that while Mother had attended some classes, she did not master any skills that would help in caring for Child. Id. at 107. Tyler indicated that Father did well at his appointments and had no concern about Father being alone with Child. Id. at 91, 109-13. Tyler testified that even though Father had completed the program, it was important for Mother to complete the program so that they would provide consistent care to Child. Id. at 115.

PAT instructor Kelly Zetwick ("Zetwick") testified that she began working with Mother and Father in September 2017. N.T., 10/31/17, at 12-13. Zetwick indicated that in her first interaction, Father made numerous threats against her after C.L. was placed in foster care. Id. at 14-15, 22. Zetwick also stated that during one session, Mother and Father properly interacted with Child and did a good job. Id. at 14, 16, 23. Zetwick testified that while Mother and Father's home was appropriate for Child, she asked them to stop smoking in the home. Id. at 21-22.

CYS Caseworker Joshua Blotzer ("Blotzer") testified that he supervised four or five visits between Child and Mother and Father. N.T., 10/31/17, at 27. Blotzer testified that Mother would usually place Child in a swing or on a blanket on the floor during visits. Id. at 34, 40, 50; see also id. at 34 (noting that on one occasion, Child spent all but 30 minutes in the swing); id. at 50 (stating that one occasion, Mother held Child for an entire visit). Blotzer indicated that Child often entertained herself during visits. Id. at 40, 48-49. Blotzer stated that Mother would also let Child cry and not pick Child up. Id. at 41, 51-52. Blotzer indicated that on one occasion after Father started yelling and stormed out of the home, Mother ran after him, leaving Child alone. Id. at 46. Blotzer noted that on two occasions, when Child was brought for a visit, Mother and Father were sleeping. Id. at 31-32, 35-37, 60. Blotzer testified that Father had completed the PCIT program. Id. at 58. Blotzer also noted that Mother and Father refused to sign releases to allow CYS to obtain

records from service providers. Id. at 37-39. Blotzer testified that while Mother and Father's home was clean, he had observed cat waste on the floor on one occasion, as well as fleas and cigarette odor in the home. Id. at 32-33, 58-59, 60, 65. Blotzer additionally stated CYS's concerns related to Mother's failure to work with PCIT, and Mother's seizure disorder, which made it difficult for her to work or have a valid driver's license. Id. at 28, 49, 63-64; see also id. at 30, 47-48 (noting that Mother has had some unrecorded seizures over the prior several years). Blotzer testified that while Mother and Father were improving their parenting skills, he was concerned about the supervision of Child, when CYS was not present, due to Mother's seizure disorder, Father's anger management issues, Mother's failure to complete services, and smoking in the home. Id. at 44-46.

Following the hearings, the trial court adjudicated Child dependent. Mother and Father filed separate Notices of Appeal and Pa.R.A.P. 1925(b) Concise Statements.

On appeal, Mother raises the following question for our review: "Whether the trial court abused its discretion [in finding] that [CYS] produced clear and convincing evidence to establish that [Child] is 'dependent' pursuant to 42 Pa.C.S.[A. §] 6302?" Mother's Brief at 7.

On appeal, Father raises the following questions for our review:

A. Did the trial court abuse its discretion in considering the records of previous dependency proceedings that involved [Father], including, but limited to, findings of fact in those cases[?]

B. Did [CYS] produce clear and convincing evidence to establish that [Child] is "dependent" pursuant to 42 Pa.C.S.[A. §] 6302?

Father's Brief at 7.

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

In re R.J.T., 9 A.3d 1179, 1190 (Pa. 2010); In re M.W., 842 A.2d 425, 428 (Pa. Super. 2004) (stating that "we will accept those factual findings of the trial court that are supported by the record because the trial judge is in the best position to observe the witnesses and evaluate their credibility. We accord great weight to the trial judge's credibility determinations.") (citation omitted).

The Juvenile Act defines a dependent child, in relevant part, as a child who

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302.

"The petitioner bears the burden of proof in a dependency hearing, and must prove by clear and convincing evidence that (1) the child is presently without proper parental care or control; and (2) such care and control is not

- 8 -

immediately available." In re R.W.J., 826 A.2d 10, 14 (Pa. Super. 2003) (citation and quotation marks omitted); see also In re J.C., 5 A.3d 284, 289 (Pa. Super. 2010) (stating that "the dependency of a child is not determined 'as to' a particular person, but rather must be based upon two findings by the trial court: whether the child is currently lacking proper care and control, and whether such care and control is immediately available.") (citations omitted). Further, "a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." In re E.B., 83 A.3d 426, 433 (Pa. Super. 2013) (citation omitted).

We will address the claims of Mother and Father together. Mother and Father contend that the trial court abused its discretion in adjudicating Child dependent. Mother's Brief at 19; Father's Brief at 18-19. Mother and Father argue that CYS presented trivial issues, which individually and as a whole, did not demonstrate through clear and convincing evidence that Child was without proper parental care or that such care was unavailable. Mother's Brief at 19, 20-26; Father's Brief at 19-22. Mother and Father assert that (1) they do not consistently smoke in the home and do not leave Child unattended while smoking outside; (2) Mother did not drive a vehicle and no evidence was produced to demonstrate Mother did not have a valid driver's license or that Mother was receiving medical treatment for seizures; (3) there was no evidence that Mother disputed that Father was the biological father and thus,

the court could not find that there was instability in the family; (4) Mother was utilizing the skills learned at PAT, and notwithstanding Mother's discharge from PCIT, she was appropriately parenting Child; (5) Father had mastered the skills learned at PCIT and PAT; and (6) their home was clean and appropriate for Child. Mother's Brief at 21-25; Father's Brief at 19-20. Mother and Father also claim that the trial court abused its discretion in relying upon their prior history of other children being adjudicated dependent. Mother's Brief at 25, 26; see also Father's Brief at 16-18, 21 (wherein Father argues that the trial court improperly took "judicial notice" of prior dependency proceedings unrelated to Child).[4]

The trial court addressed Mother and Father's claims as follows:

[W]e found that the evidence presented at the hearing did not support CYS's assertions that: 1) the home was unclean and/or unsafe; and, 2) Father had an uncooperative approach to CYS and service providers. However, sufficient credible evidence was presented to demonstrate that Mother was uncooperative with CYS and service providers; and, if custody was returned to [Mother and Father,] [Child] would have substantial periods of unsupervised contact with Mother. Mother's refusal to cooperate had to be considered in the light of her prior history with CYS and other dependency proceedings. [] CYS has been working with [Mother and Father] ... as part of dependency cases for [Child's] older siblings. [Mother and Father], both when they have resided together and when separated, have a long history of unsanitary home conditions. Also, [Child's] siblings have suffered delays in development[,] which is directly attributable to the lack of stimulation and care that they had while in [Mother's and Father's]

_____

[4] Father cites to two cases from North Carolina to support his argument. It is well-settled that Pennsylvania courts are not bound by decisions from other jurisdictions. See Branham v. Rohm & Haas Co., 19 A.3d 1094, 1103 (Pa. Super. 2011).

care and custody. Finally, [Mother and Father] have a long history of mental health diagnos[e]s, concerns and deficiencies. Their diagnos[e]s and limitations have prevented [Mother and Father] from properly understanding and addressing their children's needs. ... [N]umerous services have been provided to the [Mother and Father] to assist them with, and educate them regarding: 1) the general care of their children; 2) addressing the individual needs of each child; and 3) developing proper parenting and household maintenance techniques. However, [Mother's and Father's] cooperation with these services was previously less than adequate. For example, [Mother and Father] failed to maintain charts regarding the children's care and development; they have failed to fill out forms that they were asked to complete; and, they have failed to meet with providers for scheduled appointments/visits. The court found that Father was more motivated than Mother to meet with service providers and work to improve his parenting skills. However, due to his work schedule[,] Father has historically been unable to be in the home and provide care for the children. The court also considered a prior incident where siblings of [Child] were literally "locked into" certain rooms and left for hours with little stimulation or supervision by [Mother and Father]. The court found that Mother has difficulty directly communicating and playing with the children and she has left them alone for extended periods with no stimulation or communication. This history[,] and Mother's continued reluctance and refusal to work with service providers to improve her parenting skills[,] sufficiently demonstrates that [Child's] health, safety or welfare would be at risk if she was placed in [Mother's and Father's] care without CYS and court oversight.

Trial Court Opinion, 12/18/17, at 5-6.[5]

The record supports the trial court's determination that Mother was not

capable of providing appropriate care and control in the past with her other

_____

[5] We note that the trial court issued separate Opinions for Mother and Father. The reasoning as to the dependency adjudication in the Opinion issued as to Father, dated January 3, 2018, is substantially similar to the above-stated reasoning.

children, or in the present with Child. Indeed, she failed to comply fully with the parenting services, did not seek treatment for her seizures, and was inattentive during supervised visits with Child. Similarly, while Father has complied with PAT and PCIT, and has demonstrated signs of progression in his parenting skills, he did not fully engage with Child during visits, had previously demonstrated a history of noncompliance with his other children, and has anger issues. Moreover, Father continues to live with Mother, whose actions affect Father's ability to care for Child's welfare and needs. Thus, based upon the prognostic evidence, including the removal and adjudication of dependency of Child's sibling, C.L., less than a year prior to Child's birth, and the fact that Child was an infant, the evidence supports the trial court's determination that Mother and Father were presently without the ability to properly care and control her. See In re E.B., 83 A.3d at 433-34 (noting that while a sibling being found to be dependent is not sufficient alone to find a child dependent, the trial court found that child was properly adjudicated dependent where there were concerns whether father could care for child's special medical needs in light of his prior abuse of child's siblings); In re R.W.J., 826 A.2d 10, 15-16 (Pa. Super. 2003) (holding that trial court properly found infant child to be dependent where child's father was previously found criminally responsible for the death of a prior child, and mother had failed to complete drug and alcohol and parenting classes).

Finally, with regard to Father's claims concerning the trial court's judicial notice of other proceedings, we note that Father only specifically cites to a 2008 psychological evaluation in the trial court's Opinion. See Father's Brief at 17. However, Father has not demonstrated that such evidence was utilized in determining dependency. See id. (stating that "[i]t is unclear what facts taken at what proceeding from the previous adjudications, dispositions, and reviews, the [trial court] judge used in determining dependency in this case."). Nevertheless, as noted above, a child may be adjudicated dependent based upon evidence that a parent was neglectful or could not properly care for child's siblings. See In re E.B., 83 A.3d at 433; In re M.W., 842 A.2d 425, 430-31 (Pa. Super. 2004). Thus, the trial court did not abuse its discretion in considering evidence related to Child's siblings in determining Mother's and Father's ability to care and control Child, particularly where, as here, Child is an infant and is unable to care for herself. See In re R.W.J., 826 A.2d at 15 (noting that judges will not experiment with placing children in the home of the natural parents to determine whether they are able to care for children).[6]

Based upon the foregoing, CYS met its burden to support the adjudication of dependency, and we affirm the trial court's Order.

Order affirmed.

_____

[6] As noted above, the trial court also heard ample testimony regarding Mother's and Father's ability to care for Child.

J-A17034-18
J-A17035-18

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/26/2018