**In the Interest of E.B.**

**Appeal of E.B., Father.**

Superior Court of Pennsylvania.

Argued Oct. 9, 2013.
Filed Dec. 24, 2013.

---

Tamika N. Washington, Philadelphia, for appellant.

Patricia A. Korey, Public Defender, Philadelphia, for appellee.

Michael E. Angelotti, for Dept. of Human Services, participating party.

BEFORE: BOWES, J., DONOHUE, J., and OTT, J.

OPINION BY OTT, J.

E.B. ("Father") appeals from the order dated April 9, 2013, in the Court of Common Pleas of Philadelphia County, that adjudicated as dependent his female child, E.B., born in January of 2013, and placed her in kinship foster care with her maternal grandmother.[1] We affirm.

The juvenile court set forth the following facts and procedural history:[2]

On September 26, 2011, the Department of Human Services ("DHS") implemented In–Home Protective Services ("IHPS") to address concerns for the safety and welfare of E.B.'s older siblings, J.B. and D.B., ages six (6) and four (4) years old, respectively.

On December 2, 2011, DHS received a Child Protective Services ("CPS") report alleging that J.B. was physically abused by the children's Father [ ]; that J.B. had a scratch on his face; that when questioned about the injury, J.B. stated that Father caused the injury and that Father had hit him with a belt; and, that Father used corporal punishment as a method of discipline. This report was indicated.

On December 8, 2011, DHS received a CPS report alleging that J.B. stated that he was physically abused on December 2, 2011, by Father, and that his younger sibling, D.B., sustained a fractured clavicle in July 2011, as a result of being hit by Father, and that J.B. was currently residing with the children's maternal grandfather, K.J. This report was indicated.

On December 8, 2011, DHS obtained an Order of Protective Custody ("OPC")

for J.B. and D.B., and placed both children in the home of the maternal grandfather. The children's concurrent permanency goal is Permanent Legal Custody ("PLC").

On December 9, 2011, a Shelter Care Hearing was held for J.B. and D.B. wherein the court granted DHS temporary legal custody.

On September 3, 2012, Father was arrested and charged with driving under the influence of a controlled substance, two (2) counts of driving with a suspended or revoked license, and receiving stolen property. On November 21, 2012, Father pled guilty to receiving stolen property, and was sentenced to a minimum of three (3) months to a maximum of twenty-three (23) months confinement, with parole at three (3) months to be followed by three (3) years of reporting probation. Father was ordered to obtain his General Equivalency Diploma (GED), to receive drug and alcohol treatment, and to pay court costs and probation supervision fees. On December 11, 2012, the Honorable Alice Dubow issued an order granting immediate parole as to the receiving stolen property conviction.

On November 13, 2012, this Court held a Permanency Review Hearing for both of E.B.'s older siblings[,] J.B. and D.B. Father was not present at the hearing because, as noted in the court order, he was incarcerated at the House of Corrections. This Court ordered that both children remain committed to DHS.

On November 29, 2012, Father was arrested and charged with aggravated assault, endangering the welfare of chil-

---

1. A.B., Child's mother, has not filed an appeal from the dependency adjudication.

2. The facts set forth by the court are from the Statement of Facts alleged in the dependency petition filed by DHS with respect to E.B. The

court noted, "[n]o party disputed these facts at the April 9, 2013, adjudicatory hearing [for E.B.] . . . ." Juvenile Court Opinion, 7/5/13, at 1, n. 2.

dren wherein a parent/guardian/other commits the offense ("EWOC"), recklessly endangering another person, simple assault, and possession of an instrument of a crime; the charges stemmed from D.B.'s July 2011 fractured clavicle. Father posted bail on December 14, 2012, and a stay-away order was issued against Father.

On January [ ], 2013, Mother [ ] gave birth to E.B. prematurely, and E.B. remained at Pennsylvania Hospital. On March 11, 2013, this Court held a Permanency Review Hearing for J.B. and D.B. This Court found both parents in minimal compliance with their respective Family Service Plan ("FSP") objectives, and both children were ordered to remain as committed to DHS. In addition, this Court referred Father to the Central Evaluation Unit ("CEU") for a forthwith drug screen and monitoring.

On March 11, 2013, DHS learned that E.B., who was three (3) months old at that time, was discharged from the Pennsylvania Hospital to the care of Mother and Father on March 8, 2013. DHS arranged to meet with both parents and E.B. the following day at the home of the children's maternal grandmother, N.H.

On March 12, 2013, DHS visited the maternal grandmother's home, met with the family, evaluated the home, conducted criminal and ChildLine clearances, and developed a Safety Plan for E.B. at the maternal grandmother's home. Father and Mother agreed that E.B. would reside with the children's maternal grandmother, N.H., and the maternal great-grandmother pending the outcome of Father's criminal hearing.

The Safety Plan stated that N.H. would: ensure E.B.'s safety while E.B. resided in the home; provide for E.B.'s basic daily needs, including medical as needed; supervise all visits with Father; communicate any concerns to DHS; assist Mother with medical appointments as needed; and accept IHPS services if and when available. The Safety Plan further stated that E.B.'s maternal great-grandmother would assist with E.B.'s care when available. All parties agreed to the safety actions and signed the plan.

Juvenile Court Opinion, 7/5/13, at 1–4 (footnotes and citations to record omitted).

On March 27, 2013, DHS filed a dependency petition with respect to E.B. The adjudication hearing was held on April 9, 2013, during which Donia Butler–Todd, the DHS caseworker, testified. The juvenile court aptly summarized her testimony as follows, in part:

... [Ms.] Butler–Todd[ ] testified that E.B.'s family first became known to DHS due to injuries inflicted upon E.B.'s older siblings. Ms. Butler–Todd further testified that the injury sustained by E.B.'s sibling, D.B., who was three (3) years old at the time, was severe; D.B. suffered a fractured clavicle. Ms. Butler–Todd further testified that both E.B.'s siblings have been in DHS custody for an extended period of time. J.B. and D.B. were initially placed in DHS custody on December 3, 2011, and have been in kinship care with maternal grandfather for a total of sixteen (16) months as of the time of E.B.'s adjudicatory hearing.

Ms. Butler–Todd stated that DHS found out that E.B. was newly born to the family on March 11, 2013, after a Permanency Review Hearing was held for both J.B. and D.B. Ms. Butler–Todd testified that at that time, there was a stay-away order issued against Father in regard to E.B.'s two (2) older siblings due to criminal charges. Ms. Butler–Todd testified that she believed that

there are safety issues in the home for E.B., who at the time of the adjudicatory hearing was three (3) months old.

... Ms. Butler–Todd testified that she "continued to have concerns in regard to the baby being home while the Father still had pending [criminal] charges" due to his alleged conduct with E.B.'s older siblings. DHS reached out to the maternal grandmother in efforts to place E.B. in a safe household, and the maternal grandmother took E.B. in to assure the baby would remain safe. DHS created a twenty-one (21) day safety plan that was put into place asking the maternal grandmother to provide supervision for Father any time that he comes to visit the child. Ms. Butler–Todd testified that E.B. requires the use of an Apnea monitor for her breathing. The maternal grandmother received appropriate training regarding both infant CPR and how to properly use all medical machinery necessary for E.B.'s health needs....

Ms. Butler–Todd testified that a referral for IHPS was made, but that there is a very long waiting list for IHPS services to be implemented. Ms. Butler–Todd further testified that she had serious concerns about Father's ability to safely parent E.B. because of the previous reports of child abuse as to both of E.B.'s older siblings, and because she wanted to make sure appropriate supervision was in place. Moreover, Father's criminal charges of aggravated assault, EWOC, recklessly endangering another person, and simple assault stemming from D.B.'s July 2011, fractured clavicle were held for court and were still pending....

*Id.* at 4–5.

By order dated April 9, 2013, the juvenile court adjudicated E.B. dependent and placed her in kinship care with her maternal grandmother. The court granted Father and Mother liberal visitation supervised by maternal grandmother and scheduled a permanency review hearing for May 31, 2013. Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father presents the following issues:

1. Did the trial court abuse its discretion and commit legal error in adjudicating the child dependent under 42 Pa.C.S. § 6302, given that [DHS] did not prove by clear and convincing evidence that the child was without proper parental care and control, or that such parental care and control was not immediately available at the time of the hearing?

2. Did the trial court abuse its discretion and commit legal error in placing the child in DHS custody, given that [DHS] failed to show reasonable efforts to prevent the child's placement in DHS care?

3. Did the trial court abuse its discretion and commit legal error in placing the child in DHS custody, given that [DHS] failed to prove that such separation was clearly necessary under 42 Pa.C.S. § 6301?

Father's brief at 8.

Our Supreme Court has set forth our standard of review for dependency cases as follows:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 608 Pa. 9, 26–27, 9 A.3d 1179, 1190 (2010).

 Dependency matters are governed by the Juvenile Act, 42 Pa.C.S.A. § 6301, *et seq.*

> A "dependent child" is defined, in relevant part, as one who is without proper parental care or control, subsistence, education as required by law or other care or control necessary for his physical, mental or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian that places the health, safety or welfare of the child at risk[.] The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.

> The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency.

*In re G.T. (Appeal of S.S.)*, 845 A.2d 870, 872 (Pa.Super.2004) (internal citations and quotation marks omitted); *see also* 42 Pa. C.S.A. § 6302 (definition of dependent child).

Following a finding of dependency, the juvenile court may make an order for the child's disposition pursuant to the Juvenile Act, which is "best suited to the safety, protection and physical, mental, and moral welfare of the child." 42 Pa.C.S.A. § 6351(a). The Juvenile Act provides, in relevant part:

> § 6351. Disposition of dependent child.
>
> . . .

> (b) *Required preplacement findings.*— Prior to entering any order of disposition under subsection (a) that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:
>
> (1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and
>
> (2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; or
>
> (3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances; or
>
> . . .

42 Pa.C.S.A. § 6351(b).

Father's issues are related, and so we review them together. Father argues that DHS failed to satisfy its burden of proof to demonstrate that E.B. presently is without proper parental care and control, and that such care and control are not immediately available. In addition, Father argues the juvenile court abused its discretion and committed legal error by separating E.B. from her parents. *See In re J.M.*, 438 Pa.Super. 409, 652 A.2d 877, 880 (1995) (stating that "[e]ven if a child is adjudicated dependent under the Juvenile Act, he [or she] cannot be separated from his [or her] parents absent a showing that the separation is clearly necessary"). Finally, Father argues the juvenile court abused its discretion by failing to consider whether reasonable efforts were made prior to E.B.'s placement to prevent her removal from the home.

The crux of Father's argument is that his pending criminal matter, relating to the incident involving D.B., and the above-described stay-away order, are insufficient evidence on which to find E.B. dependent. Specifically, he asserts DHS failed to present evidence of any safety risks to E.B. Father asserts that DHS found Father's and Mother's home appropriate, and that E.B. was in the care of Father and Mother "prior to DHS'[s] implementation of a 'safety plan,' but that there was no concern of abuse or neglect of that child." Father's brief, at 21. Father asserts that the reports of his alleged physical abuse against the older children were "unfounded."[3] Further, he asserts that the incident underlying his pending criminal matter did not result in DHS seeking "to petition the court, or to have the children removed from the parents' care at the time." *Id.* at 14, 652 A.2d 877. Moreover, Father asserts that the stay-away order does not affect his "right to care for the child[ren]'s sibling in a dependency matter." *Id.* at 21, 652 A.2d 877. In addition, he asserts he complied with his Family Service Plan ("FSP") objectives of parenting and anger management with respect to the older children's dependencies, and that Mother has been cooperative with DHS, and has been seen meeting E.B.'s needs; as such, Father implies Mother was immediately available to provide proper parental care and control of E.B.

The Child Advocate counters that Father's argument is flawed and misleading. The Child Advocate argues in its appellee brief:

[Father] claims that the stay away order in the criminal matter for aggravated assault and child endangerment "does not affect his right to care for [E.B.]'s sibling" when, in fact, it is highly relevant to Father's ability to provide safe and adequate care for this child. [Father] then misrepresents that "DHS did not see fit to remove the older siblings from the home" after the incident underlying the criminal charges. In fact, in December 2011, when DHS became aware of the two incidents of abuse, which occurred in July 2011 and December 2011, they immediately sought an [order of protective custody] and those children have remained in DHS's custody since that time.

Moreover, [Father's] claim that "Mother was seen with [E.B.] and Mother was meeting [E.B.]'s needs" neglects the fact that Mother was only seen with [E.B.] after the [c]hild was placed in the care and protection of [the] [m]aternal [g]randmother, pursuant to the safety plan implemented by DHS. Furthermore, [Father's] claim neglects the very clear testimony of Ms. Butler[-Todd] that she was concerned about Mother's ability to properly monitor E.B. and keep her safe with regard to Father.[4]

Finally, [Father's] claim that "the child was in the care of parents prior to DHS'[s] implementation of a safety plan" and that "there was no concern or abuse or neglect of the child" ignores the fact that DHS acted to place [E.B.] with [m]aternal [g]randmother and to

---

3. Upon review, it is not clear from the certified record whether DHS's investigations of the CPS reports of December 2, 2011, and December 8, 2011, resulted in a determination of "founded." Nevertheless, we conclude sufficient record evidence exists to support the court's adjudication of E.B. based on the pending criminal charges against Father relating to D.B.'s injuries, described above.

4. Ms. Butler–Todd testified that Mother was not at home when the injuries to the older children occurred. Ms. Butler–Todd testified her concerns regarding Mother were whether "she is going to be able to properly monitor this child and keep her safe in regards to the Father being supervised." N.T., 4/9/13, at 6.

implement the safety plan as soon as they learned that [E.B.] had been released from a three[-]month hospital stay.... Thus, contrary to [Father's] representations, DHS acted immediately to remove E.B. from the parents' home and to place her in a safe environment with [m]aternal [g]randmother as soon as they became aware of [E.B.'s] release from the hospital.

Child Advocate's brief, at 23–25 (citations omitted). Based on our review of the testimonial evidence, we agree.[5]

■ It is well-settled that "a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *In re R.W.J.*, 826 A.2d 10, 14 (Pa.Super.2003). In *Matter of DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1976), this Court rejected the argument that a child cannot be adjudicated dependent unless the child is actually in custody of the parents and they are shown unable to render care or control as defined in the Juvenile Act. We explained:

> Obviously, state interference with a parent-child relationship is a most serious intrusion ... such an intrusion is properly tolerated only in cases in which the Commonwealth sustains a very strict burden of proof.... The rule of law appellants request us to announce is overly restrictive. The legislature defined ["dependent child"] in exceedingly broad terms precisely because it is impossible to foresee all the possible factual situations that may arise. Further the broad definition enables the experienced juvenile court judge to apply his training and

compassion to the unique facts of each case. The proposition asserted by appellants would compel the juvenile court judge to place the child in the home of the natural parents to determine whether they are able to render proper care, and ignores the possibility that if the "experiment" proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal.

*Id.* at 241–242.

■ Instantly, the juvenile court reasoned as follows:

> While this Court is mindful that a child should not be adjudicated dependent merely because a sibling has been adjudicated dependent, this Court has serious concerns that Father can properly care and control three (3) month-old E.B., and attend to her special medical needs. E.B. currently uses an apnea monitor, which monitor the maternal grandmother can supervise subsequent to her having received appropriate training. Given that Father: has a stay-away order against [Child's] older siblings due to reports of physical abuse; ... is in-and-out of the criminal system and currently serving probation; has two (2) indicated reports of physical abuse against E.B.'s siblings, both of whom were under the age of five (5) when the incidents were reported; is currently facing serious criminal charges for the fractured clavicle sustained by D.B. in July 2011; ... this Court cannot in good consci[ence] allow the vulnerable three (3) month-old E.B. to remain in Father's home.

> The totality of the circumstances compelled this Court to find by clear and

---

5. Likewise, with respect to Father's assertion that DHS found Father's and Mother's home appropriate, the record belies the assertion. On cross-examination by Mother's counsel, Ms. Butler–Todd testified that she did not assess the parents' home because they were not at home when she visited on March 11, 2011. Rather, she assessed E.B.'s safety on March 12, 2011, but it was at the maternal grandmother's home where Father and Mother had taken the child on that date. N.T., 4/9/13, at 10–11.

convincing evidence that Father's actions placed the health, safety, and welfare of E.B. at risk, and that E.B. lacked immediate proper parental care and control.

Juvenile Court Opinion, 7/5/13, at 9–10 (citations omitted). Further, with respect to whether DHS made reasonable efforts prior to E.B.'s placement to prevent her removal from the home, the juvenile court reasoned that, based on Father's pending criminal matter, the long waiting list for IHPS services, and

> the urgent need to find a safe home for the recently discharged three (3) month-old E.B., [DHS] approached the maternal grandmother and developed a safety plan. [DHS] did offer preventive services for the family. However, due to circumstances beyond [DHS's] control, placement with the maternal grandmother was necessary.

*Id.* at 11.

We discern no abuse of discretion by the juvenile court based on the totality of the circumstances in this case and the appropriate legal principles. In this case, the court placed E.B. in kinship foster care and granted Father and Mother liberal visitation. Further, the court scheduled a permanency review hearing for May 31, 2013, which was less than two months from the date of the adjudication. The court will continue to review this matter at the permanency hearings and consider the outcome of Father's pending criminal matter, which may have an effect on whether E.B. will remain a "dependent child." Upon careful review, we conclude that DHS met its evidentiary burden to support the adjudication order. Accordingly, we affirm the order.

Order affirmed.