J-S68015-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1288 WDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Fayette County Criminal Division at
No(s): CP-26-DP-0000099-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: K.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1289 WDA 2019 |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Fayette County Criminal Division at
No(s): CP-26-DP-0000098-2019

BEFORE:  GANTMAN, P.J.E., LAZARUS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:          **FILED JANUARY 21, 2020**

D.S. appeals from the order of adjudication and disposition entered by

the Court of Common Pleas of Fayette County (trial court) adjudicating her

_____

[*] Retired Senior Judge assigned to the Superior Court.

children, K.S. and J.S. (Children) dependent and ordering that they remain in foster care.[1]  We affirm.

We take the following facts from our independent review of the certified record.  D.S. and B.S. began fostering the Children (twins born June 2007) on May 5, 2008, and they adopted them on January 27, 2010, when the Children were approximately three years of age.  B.S. passed away in September 2010.  On May 20, 2019, Fayette County Office of Children, Youth & Youth Services (CYS) intake supervisor Rebecca Pegg received a report that D.S. was locking the Children in their bedrooms seven days per week from 5:30 p.m. until approximately 6:00 a.m. the next day.  (*See* N.T. Hearing, 7/18/19, at 4).

On May 21, 2019, a CYS caseworker met with D.S. at the home.  D.S. admitted that she had been locking the Children in their rooms since they were three-years-old to keep them safe because she heard of an incident in Ohio wherein a three-year-old child got up at night and started a fire.  (*See id.* at 5, 12).  D.S. stated that J.S. keeps bottles in his bedroom in case he needs to urinate and that K.S. will call for her if she needs to use the bathroom.  (*See id.* at 22).  The CYS worker explained to D.S. that locking the Children in their rooms is inappropriate and a fire hazard but that D.S. did not appear to understand why this was inappropriate.  The Children were placed with a family friend that day that the trial court approved of.  When

_____

[1] The Children's father B.S. passed away in September 2010.

the family friend was unable to keep the Children long term and D.S. could not locate any other possible caregivers for them, on May 28, 2019, D.S. signed a voluntary consent to placement. (**See id.** at 13).

On June 7, 2019, CYS filed a dependency petition alleging that the Children were without proper care or control and that it was in their best interest to be adjudicated dependent and placed in the custody of CYS for placement in the foster home of L.M. and E.B. On July 18, 2019, the court held an adjudicatory hearing. Because Rachael Friend (Friend), the caseworker assigned to the case was on vacation, CYS intake supervisor Rebecca Pegg (Pegg) testified from her knowledge of the case and from CYS records. She stated that J.S. confirmed that he was locked in his bedroom at 5:30 p.m. seven days a week because D.S. was afraid that he and K.S. would leave their rooms during the night. (**See id.** at 6-7). J.S. stated that he urinated in bottles overnight and, if he got hungry, D.S. would slide a piece of candy under his bedroom door for him. (**See id** at 5**.**). On Saturdays, he would play in his room upon waking until D.S. let him out to empty any bottles he used during the night, but according to J.S., he only left the home on the weekends if D.S. needed to take them with her to go shopping or to go to church. (**See id.**). Friend's report indicated that K.S. confirmed that the Children are locked in their bedrooms at night from 5:30 p.m. but stated that her bedroom is closer to D.S.'s, so D.S. would let her out of her bedroom at night to use the bathroom if K.S. yelled for her to do so.

Pegg testified that the Children have hyperactivity behaviors and some social deficits, and, according to their school, do not participate in any extracurricular activities, but merely go to school, go home and attend church on Sundays. (*See id.* at 9-10). The Children do not have any friends with whom they spend time with and do not seem to play outside. (*See id.* at 10).

Pegg stated that CYS is worried that D.S. is overwhelmed and may need some help or support during after-school hours so that she can learn to manage the Children without locking them in their bedrooms. (*See id.* at 9). She also stated that CYS has some concerns about D.S.'s parenting deficits and lack of understanding and accountability about the severity of the Children being locked in their bedrooms for extended periods of time. (*See id.* at 11).

She testified that CYS believes dependency and placement for the Children would be best for them while the agency works with D.S. to complete a Family Service Plan (FSP). (*See id.* at 13-14). The long-term goal is to reunify the Children with D.S. and put services in the home to work with her on parenting and any underlying mental health concerns that would need to be addressed. (*See id.*). Pegg testified that D.S. did submit to a psychological evaluation on July 1, 2019, and there were no concerns raised in that evaluation. (*See id.* at 18).

The Children's Guardian *ad litem* (GAL) testified that the Children were doing well in foster care and that when she asked them what they wanted, they stated that they wanted to go home just to see their dog. (*See id.* at

45). The Children also are "gleeful" when playing with the other children outside while in their placement, (s**ee id.**) and that they also want to stay where they are. (**See id.**). She also stated that she was concerned that Mother was not seeing Children that much, but when she asked Mother why that was so, she said she was busy. The Children indicated that they would like to see her more. (**See id.** at 46.)

D.S. testified on her own behalf at the hearing. She stated that she takes the Children to all regularly scheduled doctor's appointments and that the doctor has not expressed any concern about mental health issues. (**See id.** at 21). She admitted to locking the Children in their bedrooms at night out of concern that they might get up in the night and start a fire on the stove or get into something else, but maintained that she would do this at 7:00 p.m., not 5:30 p.m. (**See id.**). D.S. also maintained that she lets the Children out to use the bathroom if necessary, and that she gives them snacks and water to take to their bedrooms at night. (**See id.** at 22). She showed photographs to support her testimony that she changed the locks on the bedroom doors so that she can no longer lock them from the outside. (**See id.** at 22-23). She stated that she understood CYS's safety concerns about the Children being locked in their bedrooms and that she does not intend to do so in the future. (**See id.** at 23). However, she put alarms on their doors so she would know if they were opened overnight. (**See id.** at 23). D.S. introduced the certificate of completion for parenting classes she attended.

(*See id.* at 23-24). She stated that the Children have a swing set and that they play outside, although they must stay in the shade because of their sensitive skin and, although individuals at the school contributed to buy bikes for the Children while in foster care, once they come home, they will not be allowed to ride them on the street, only in the yard. (*See id.* at 25, 35). Although the Children are involved in church and attend vacation bible school in the summer, D.S. confirmed that they have no other extra-curricular activities and have not attended any birthday parties or sleepovers. (*See id.* at 26, 30-31). Since the Children have been in foster care, she does see them but not as often as she would like. (*See id.* at 36-37).

Bryan Kelly, the Pastor at Bethel Baptist Church, testified on D.S.'s behalf. (*See id.* at 39-41). He testified that the Children attended Sunday school classes, vacation bible school and other extracurricular church activities, and that he had absolutely no concerns about their behavior. (*See id.* at 39-41). The Children's foster parents have not reported any behavioral problems of the Children. (*See id.* at 10).

During closing statements, counsel for CYS, Mr. Anthony S. Dedola, Esquire, acknowledged that D.S. does not understand the parameters of proper parenting and is "so restrictive." (*Id.* at 43). However, he maintained that this could be addressed by adjudicating the Children dependent so that CYS could give them the assistance that the family needs, but that the

Children should be returned to the home with intensive services, not kept in foster care. (**See id.**).

At the close of the hearing, the court granted the dependency petition and continued the Children's placement in foster care. (**See id.** at 44-45). D.S. timely filed a notice of appeal and a contemporaneous Rule 1925(b) statement. **See** Pa.R.A.P. 1925(a)(2)(i).[2] On appeal, D.S. challenges the trial court's finding of dependency and placement in foster care.[3] Specifically, she argues that the court erred in finding that the Children presently lack proper parental care and control and that it was necessary to remove them from her custody. (**See** D.S.'s Brief, at 8-22).

The Juvenile Act, 42 Pa.C.S. §§ 6301-6375, controls the disposition of dependency matters. The Act defines, "Dependent Child," in pertinent part, as a child who:

> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other

---

[2] The trial court did not file a Rule 1925(a) opinion and CYS did not file a brief. **See** Pa.R.A.P. 1925(a); Pa.R.A.P. 2112.

[3] "[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion." **Interest of I.R.-R**, 208 A.3d 514, 519 (Pa. Super. 2019) (citations and internal quotation marks omitted).

custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302.

"The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." *In re E.B.*, 83 A.3d 426, 431 (Pa. Super. 2013) (citations omitted). "'Clear and convincing' evidence has been defined as testimony that is 'so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (citation omitted).

"In accordance with the overarching purpose of the Juvenile Act '[t]o preserve the unity of the family whenever possible,' *see* 42 Pa.C.S.A. § 6301(b)(1), a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available." *Id.* (case citation and some internal quotation marks omitted). "This Court has defined 'proper parental care' as 'that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child.'" *Id.* (citation omitted).

With these principles in mind, we turn to D.S.'s first argument that "[t]he trial court's conclusion that [C]hildren are without proper parental care and control is not supported by the record." (D.S.'s Brief, at 11). Specifically, she maintains that the evidence of record does not support the trial court's

findings that D.S. suffers from psychological issues that have yet to be addressed and that she has engaged in psychological abuse of the Children. (*See id.* at 12-15).

At the hearing, the trial court observed that "[D.S.] is so fearful and so possessive and so overprotective that something is going to happen to these children that she has eliminated half of their life." (N.T. Hearing, at 44). The court acknowledged that a previous psychological evaluation of D.S. did not reveal any mental abnormalities. (*See* N.T. Hearing, at 44). D.S. testified that she has taken the Children to all doctor's appointments and that there have been no mental health concerns expressed by the physician. She acknowledged that she did lock the Children in their bedrooms in the past, but she provided photographic evidence that she had removed the locks and stated that she understood CYS's safety concerns. She provided a certificate of completion for parenting classes she had attended at CYS's recommendation. (*See* N.T. Hearing, at 21-25). Pastor Kelly testified that the Children attended Sunday school classes, vacation bible school and other extracurricular church activities, and that he had absolutely no concerns about their behavior. (*See id.* at 39-41). The Children's foster parents have not reported any behavioral problems of the Children. (*See id.* at 10). Further, we note that CYS failed to provide any testimony or evidence of a professional evaluation of D.S.'s present parenting abilities and the Children's prospects with her.

However, the court adjudicated the Children dependent because:

> . . . What cannot be seen by a sterile reading of the transcript is that [D.S.] has a bland manner of soft speaking and general flat affect. She appears to be a nice person, however she shows no emotion. Her responses are blunt and appear to be almost like she is in a daze. The [c]ourt heard no testimony from her that this behavior and conduct in isolating the Children is wrong. In fact, the [c]ourt believes that [D.S.] actually believes that the conduct is appropriate in safe guarding the [C]hildren and preventing catastrophe. She appears to not appreciate the necessity of social interaction with peers or the importance of play. She does not seem to appreciate the importance of activities or the detrimental effect of locking the [C]hildren for 11 ½ hours per day in their bedroom.
>
> . . . [D.S.] is behaving knowingly and is making a conscious decision to raise the [C]hildren in this fashion. [She] admitted there are no birthday parties, no sleep-overs, no playmates, and no outside play if it is sunny outdoors.

(*Id.* at 5).

Based on all of the foregoing, we conclude that the trial court properly adjudicated the Children dependent where they are without the proper parental "care or control necessary for his physical, mental, or emotional health[.]" 42 Pa.C.S. § 6302; *see also In re R.R.*, 686 A.2d. 1316, 1318 (Pa. Super. 2004) ("[T]he Juvenile Act permits a finding of dependency if clear and convincing evidence establishes that a child is lacking the particular type of care necessary to meet his or her individual [] needs.") (citation omitted).[4]

_____

[4] We are not persuaded by D.S.'s argument that the court applied an incorrect "best interest of the child" standard. (*See* D.S.'s Brief, at 19-22). A review of the court's opinion reveals that it focused on the Children's health and development. (*See, e.g.*, Trial Ct. Op., at 4 (D.S. "suffers deficits in

However, this does not end our inquiry because D.S. also maintains that the court erred by finding that it was necessary to remove the Children from her custody. (*See* D.S.'s Brief, at 16-24). Specifically, she argues that her past instances of abuse or difficulty with handling the Children are not sufficient to support removing them from the home because there is no evidence this behavior will continue in the future. (*See id.* at 16-19).

We have stated the following regarding whether a child should be removed from parental control:

_____

understanding the severity of imprisoning her children."); *id.* at 5 (D.S. "actually believes that [her] conduct is appropriate in safe guarding the children"); *id.* at 6 ("The [c]ourt has concerns that [D.S.] has not internalized how this isolation could affect the children.").

Neither are we persuaded by the cases on which D.S. relies because they are distinguishable. For instance, in *In re D.A.*, 801 A.2d 614 (Pa. Super. 2002), we found that mother's depression diagnosis, which occurred two years prior to the child's birth, her failure to sanitize bottles, and her juvenile arrest for child abuse committed while babysitting five years ago, did not support a finding that mother currently was unable to provide proper care and control for child. *See In re D.A.*, *supra* at 619-21. Conversely, here, the acts at issue were not isolated incidents from D.S.'s past, but instead were still concerns at the time of the hearing. In *In re Swope*, 571 A.2d 470 (Pa. Super. 1990), we reversed a trial court's finding of dependency where there was not any testimony addressing the parent's abilities and shortcomings or whether the alleged acts were isolated incidents or likely to recur. *See id.* at 490. This is distinguishable from this case where there was testimony that D.S.'s actions had occurred consistently for nine years and were likely to recur without intervention. While we acknowledge that in *Swope*, one of the factors we considered was the lack of psychological evaluation, in this case, it is the intention of both the court and CYS that the Children be adjudicated dependent and returned to foster care precisely so that such intensive services can be provided.

> The law is clear that a child should be removed from her parent's custody and placed in the custody of a state agency only upon a showing that removal is clearly necessary for the child's well-being. In addition, this court had held that clear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with her family are unfeasible.

*In re A.B.*, *supra* at 349-50 (citation omitted). Ultimately, a hearing court is given broad discretion in meeting the goal of entering a disposition "best suited to the protection and physical, mental, and moral welfare of the child." *In re Lowry*, 484 A.2d 383 (1984).

In this case, there is clear and convincing evidence for the trial court not to accept CYS's recommendation at the hearing that alternative services were preferable and that Children be reunited with D.S. (*See* N.T. Hearing, at 43).[5] The trial court rejected that view for the same reasons that it made the dependency finding – that D.S. was overprotective and would remain abnormally overprotective if the Children were returned to her care and that she needed more parenting training. While it found the ultimate goal was to reunite Children with her, the trial court noted that D.S. only visited Children once a week while they were in foster care and that visits several times a week were more appropriate. Specifically, it found that D.S. should be more involved with the Children in the community setting with foster parents so that

---

[5] On appeal, CYS now represents that the trial court was justified in continuing foster care placement for the Children because psychological evaluations need to be conducted and the Children voiced a preference that they stay in foster care. (*See* CYS's Brief, at 21).

she can understand and be comfortable that they can ride their bikes, have children over without danger, and that they live like normal twelve year olds. It then ordered D.S. to have increased contact and ongoing communication with the Children and be involved in their activities and the Children needed to have a psychological evaluation. In effect, it found that D.S.'s parenting skills had not yet advanced sufficiently to order the return of the Children to her care.

Accordingly, because the trial court's order is supported by clear and convincing evidence from which it could find that the Children's placement in foster care was necessary, we affirm the trial court's order continuing the Children's placement in foster care.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/21/2020