J-S15030-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2831 EDA 2023 |

Appeal from the Order Entered October 23, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000722-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: M.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2833 EDA 2023 |

Appeal from the Order Entered October 23, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000724-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: N.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2834 EDA 2023 |

Appeal from the Order Entered October 23, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000725-2023

BEFORE:   OLSON, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED AUGUST 6, 2024**

L.L. (Mother) timely appeals[1] from the orders adjudicating three of her children, J.L., then aged fourteen; N.L., then aged five; and M.L., then aged two (collectively, Children), dependent; removing them from Mother's home; and committing them to the custody of the Philadelphia Department of Human Services (DHS).   Mother argues that the evidence was insufficient to adjudicate Children dependent and to place Children in foster care.   We affirm.

### Factual Background

Mother resides in "a really big house" with four to seven bedrooms. N.T., 10/23/23, at 68, 71.  On August 7, 2023, DHS filed dependency petitions for six of Mother's minor children, three of whom are the subject of this appeal.[2]   ***See, e.g.,*** Juvenile Ct. Certified Docket, CP-51-DP-725-2023, 1/30/24, at 1, 3.  For ease of reference, we refer to these six children as "Siblings."[3]  At the dependency hearing on October 23, 2023, DHS withdrew

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother's three separate appeals were consolidated by this Court *sua sponte* on November 21, 2023, as they involve related parties and issues.  **See** Order, 11/21/23, 2831 EDA 2023, 2833 EDA 2023, 2834 EDA 2023.

[2] Specifically, DHS filed dependency petitions for the following children: A.L., S.L., Ny.L, J.L., N.L., and M.L.  **See** Juvenile Ct. Certified Docket, CP-51-DP-725-2023, at 3.

[3] The testimony in this matter often references "children" without identifying which of the six Siblings was involved in the described incidents and conditions, which makes it difficult at times to identify whether Mother's
*(Footnote Continued Next Page)*

its petition for the eldest of Siblings, A.L., as this child was no longer a minor. *Id.* at 4-5. Additionally, at the time of the hearing two of the Siblings, fifteen-year-old S.L. and eleven-year-old Ny.L. no longer resided with Mother. *Id.* at 5, 13.

At the October 23, 2023 dependency hearing, a DHS social worker and a Community Umbrella Agency (CUA) caseworker recounted their contacts with Mother's household beginning in April 2023, including: three General Protective Services (GPS) reports,[4] two Child Protective Services (CPS) reports, five DHS investigations in response to these reports, and weekly home visits to check in with Mother and Siblings. Trial Ct. Op., at 1-7; N.T. at 8-17, 22, 63; *see also, e.g.,* Dependency Pet. for N.L., CP-51-DP-725-2023, 8/7/23, at 2-8 (unpaginated). Mother, J.L., and Ny.L. also testified at the hearing. N.T. at 68-92, 92-99, 102, 110-116.

It is undisputed that from April 2023 to October 2023, Mother had caused three Siblings to be involuntarily committed to inpatient psychiatric facilities.[5] Trial Ct. Op. at 1-7; N.T. at 8, 11-13, 89-90. In June of 2023, S.L.

_____

conduct applied to or was directed toward a specific child. Nonetheless, as Mother does not dispute that the testimony referencing "children" applied to all Siblings, we shall treat it as such.

[4] The June 24, 2023 GPS report was validated, and the September 29, 2023 GPS report was in the validation process at the time of the dependency hearing. N.T. at 8, 15.

[5] Involuntary treatment of a person believed to be "severely mentally disabled and in need of immediate treatment," and involuntary commitment of that person to an inpatient psychiatric facility, are governed by 50 P.S. §§ 7301-7306.

disclosed to the DHS social worker that "[M]other would often lock [S.L.] out of the home. She would withhold food, [Siblings] were only being fed Oodles of Noodles and cereal, and [S.L.] essentially did not feel safe returning to the home when [S.L.] was discharged [from the psychiatric hospital]." N.T. at 10. The report of this incident was determined to be valid. *Id.* Mother repeatedly refused to pick up S.L. from the psychiatric hospital when the facility was ready to discharge this child after an involuntary commitment initiated by Mother, and Mother only agreed to pick S.L. up after caseworkers met with Mother specifically to persuade her to do so. *Id.* at 8-9, 22-23. The DHS social worker testified that

> [M]other also did not want [S.L.] to return to the home. She preferred that S.L. be placed.
>
> And due to [S.L.] being declined placement, myself and CUA came out to [M]other's home and we had a discussion, and in a sense, [M]other finally made contact with the case manager at the hospital, and [M]other picked [S.L.] up from the hospital.
>
> But if we did not have that conversation with [M]other, I don't think [M]other would've been compliant with picking [S.L.] up from the hospital because [M]other wanted [S.L.] in placement.

N.T. at 23 (some formatting altered). Mother testified that she did not want S.L. to return to her care as S.L. was self-harming and also harming N.L. and M.L. *Id.* at 83-84.

The police have been called to Mother's house "at least 50 times." *Id.* at 79, 89. Mother often called the police due to conflicts between herself and Siblings. *Id.* at 11, 79. Ny.L. and the CUA caseworker testified about Mother's

physical abuse of Siblings, such as beating them with cords, stomping on their heads, and attempting to attack Ny.L. with a screwdriver. *Id.* at 15, 59, 95-96.

Testimony from the DHS social worker, J.L., and Ny.L described living conditions where while Siblings were not malnourished, Mother did not adequately feed them; that Mother withheld food from Siblings as a form of discipline or punishment; and that there was little nutritious food in the house during DHS visits. *Id.* at 10-11, 24-25, 33, 35, 95-97, 111. The DHS social worker, the CUA caseworker, Ny.L., and J.L. testified that in June 2023 Mother had disposed of Siblings' mattresses and did not replace them, thereby forcing Siblings to sleep on the floor, sometimes with no pillows or blankets.[6] *Id.* at 16-18, 25, 57, 59-62, 64-67, 95, 116. When caseworkers informed Mother that these sleeping conditions for Siblings were unacceptable, Mother responded she had the means to purchase new bedding and would do so. *Id.* at 16-18, 66-67. However, Mother did not purchase new bedding, and when the CUA caseworker gave J.L. an air mattress for his use, Mother returned the air mattress the following week. *Id.* Mother testified that she had disposed of the mattresses because they were soiled; that N.L. and M.L. sleep with her on a California king-sized bed; and that she does not force J.L. to sleep on the

---

[6] Ny.L. testified regarding sleeping conditions that, "We sleep on the floor[,]" and that "we sometimes get blankets. . . . Sometimes; not all the time." N.T. at 95.

floor, but that he chooses to sleep on the floor instead of on a couch.[7] *Id*. at 70-72, 90.  The juvenile court found Mother's testimony that she does not force Siblings to sleep on the floor was not credible.  Trial Ct. Op. at 8, 10-11.

Both the DHS social worker and the CUA caseworker testified about their concerns with J.L.'s school attendance, noting that J.L. had already been absent 19 days in the first two months of the 2023-2024 school year.  N.T. at 18-19, 53-54.  The CUA caseworker testified that J.L. had explained to her that "he was not attending because he was told to go wash up, and when he would come down – back downstairs, his mom was gone[,]" and that Mother had stated that "[J.L.] could walk" to school.  *Id.* at 53-54.

The DHS social worker testified that she had concerns about Mother's and J.L.'s mental health, and recommended evaluations to identify any developmental delays for N.L. and M.L.; that Mother appeared to view Siblings, especially the older children, as her peers, and throughout the investigation Mother directed anger and aggression towards Siblings; that Mother had declined DHS' offers of mental health therapeutic services; that Mother needed domestic violence counseling and a behavioral health

_____

[7] In response to Mother's testimony, Ny.L. testified: "When [Mother] said that we had the choice to sleep in the family room – no, we didn't.  She would force us to go upstairs.  So, she would lock us out of the room and keep the babies in there[.]"  N.T. at 93-94.  J.L., when asked where he sleeps in Mother's house, stated that he sleeps on the floor and that he does not have a choice about it, although he generally has a pillow and a blanket, and that he cannot sleep on the couch, as Mother testified, as Mother slept on the couch.  *Id.* at 110-11.

evaluation before she could appropriately care for Siblings; and that Mother lacked adequate ability to care for Siblings' daily basic needs. *Id.* at 20-28. The CUA caseworker ultimately testified that Siblings' needs were not being met in Mother's home and that Siblings were not safe in Mother's home. *Id.* at 61-62.

At the conclusion of the hearing, the juvenile court adjudicated Siblings dependent and ordered that Siblings be placed in foster care. As the juvenile court was issuing its ruling, Mother stated that she was not guilty of "any abuse or neglect on my children[,]" and that she "didn't do anything wrong." *Id*. at 107, 114-115.

Mother filed timely notices of appeal from the order adjudicating Children dependent. Mother and the juvenile court both complied with Pa.R.A.P. 1925.

Mother raises the following issues on appeal:

1. Whether the [juvenile] court erred in deciding the evidence having been sufficient for a finding of adjudication regarding J.L., M.L. and N.L.

2. Whether the [juvenile] court erred in deciding the evidence having been sufficient for the removal of J.L., M.L., and N.L. from the family home.

Mother's Brief at 7 (some formatting altered).

### Finding of Dependency

In her first claim, Mother argues that the juvenile court erred in concluding that Children were dependent because DHS failed to prove by clear

and convincing evidence that Children were without proper parental care. *Id.* at 11. Specifically, Mother contends that the evidence did not establish there was any threat to Children's safety or health related to bedding. *Id.* at 13. Mother asserts that J.L. has adequate bedding but J.L. "elected to sleep somewhere else in [Mother's] home." *Id.* (citations omitted). Mother also claims there are no concerns for bedding for M.L. and N.L., who sleep in Mother's bed. *Id.* Mother notes that the DHS social worker testified that Children were not malnourished. *Id.* Mother states that two-year-old M.L. and five-year-old N.L. "did not require mental health services" but is silent on this matter with regard to J.L., and does not address that the DHS social worker recommended early intervention and developmental evaluations to assess the status of M.L.'s and N.L.'s mental health. *Id.*; N.T. at 27-28.

Our standard of review for dependency cases is to accept the findings of fact and credibility determinations of the juvenile court if they are supported by the record. *In re E.B.*, 83 A.3d 426, 430 (Pa. Super. 2013). We are not, however, required to accept the juvenile court's inferences or conclusions of law. *Id.* We therefore review for an abuse of discretion. *Id.*

Dependency matters are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301-6375, which defines a "Dependent child," in relevant part, as:

> A child who [] is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

- 8 -

42 Pa.C.S. § 6302.

> This Court has explained:
>
> The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: **whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.**
>
> The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency.

*In re G., T.*, 845 A.2d 870, 872 (Pa. Super. 2004)) (some formatting altered and emphasis added), see also *E.B.*, 83 A.3d a 431 (same). "Moreover, a child should not be found to be dependent merely because a sibling has been adjudicated dependent." *G., T.*, at 845 A.2d at 872.

The *G., T.* Court affirmed dependency for a physically unharmed child, based on the severe harm that befell that child's sibling who had also been adjudicated dependent. *See id.* at 873-74. In *G., T.*, the harm to a sibling was caused by the parents' "lack of knowledge and/or awareness of [the sibling's] obvious and serious medical needs." *Id.* The *G., T.* Court found that the parents' ability to care for their children placed both children at risk, and the harm that had already been inflicted on the sibling could also happen to the child, as the conditions that led to that harm still existed. *Id.*

In assessing whether a child is presently without proper parental care and control and, if so, whether such care and control are immediately available, "the [juvenile] court **must** consider 'not only what sort of parental

care the child received in the past, but also what sort of parental care the child will receive if custody is given to the parents.'" *In re Swope,* 571 A.2d 470, 472 (Pa. Super. 1990) (emphasis in original; citation omitted). Noting that evidence of "whether specific acts of abuse had occurred [] was sharply contested," that no testimony addressed "what sort of care [child] would receive in the future if returned to [the parent,]" and that the record lacked sufficient evidence regarding the parent's "abilities and shortcomings as a parent" or "whether [the parent's] alleged acts were isolated incidents or were likely to recur[,]" the *Swope* Court remanded to determine whether the parent "would be incapable of rendering proper parental care **in the future**." *Id.* at 473 (emphasis added; citation omitted).

In *In re R.W.J.*, this Court recognized that

> a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent. *In* [*re*] *Black*, 417 A.2d 1178 (Pa. Super. 1980) (holding prognostic evidence sufficient for finding of dependency of newborn infant where parent's two previous children died because of parent's improper care and failure to take necessary precautions). The [juvenile] court must make a comprehensive inquiry into whether proper parental care is immediately available or what type of care [a parent] could provide in the future. [*In re*] *DeSavage*, 360 A.2d 237 (Pa. Super. 1976) (rejecting argument that child cannot be adjudicated dependent unless child is actually in custody of parents and they are shown unable to render care or control as defined by statute). In this regard, the *DeSavage* Court reasoned:
>
> > . . . **[T]he broad definition [of "dependent child"] enables the experienced juvenile court judge to apply his training and compassion to the unique facts of each case.**

*Id.* at [] 242.

*In re R.W.J.*, 826 A.2d 10, 14-15 (Pa. Super. 2003) (emphasis added). Applying this approach to the question of dependency, *R.W.J.* approved of the juvenile court's "full consideration of whether proper parental care is immediately available to [child] and what type of care [parent] can provide in the future." *Id.* at 15 (citations omitted).

> Here the juvenile court explained:
>
> Because of . . . Mother's failure to provide mattresses for children, Children's lack of mental health treatment, Children repeatedly being sent to mental health hospitals, Children's truancy, and Mother's failure to ensure Children's basic needs are being met, this court does not believe Mother can provide Children with proper parental care and control. Accordingly, this court found sufficient evidence to adjudicate Children dependent pursuant to 42 Pa. C.S.[] § 6302(1).

Trial Ct. Op. at 9-10 (some formatting altered).

Following our review of the record, we discern no abuse of discretion by the juvenile court in adjudicating Children dependent. *See E.B.*, 83 A.3d at 430. The record shows that in a span of six to seven months in Mother's household, Mother caused three of Children's siblings to be involuntarily committed to psychiatric hospitals. N.T. at 8-9, 22-23. Mother refused to pick up one sibling from the psychiatric hospital until caseworkers intervened. *Id.* The police have been called to Mother's home at least 50 times to intervene in frequent conflicts between Mother and Siblings, including conflicts which included allegations of Mother's physical abuse of Siblings. *Id.* at 79, 89, 95. Mother withheld food from Siblings as a form of discipline or

punishment, and when Mother did feed Siblings it was frequently noodles and cereal; additionally, the DHS social worker and the CUA caseworker reported finding little food in the house during visits and were concerned about whether Siblings were properly nourished. *Id.* at 10-11, 24-25, 33, 35, 95-97, 111.

With regard to sleeping conditions, Mother testified that "[my two youngest children, M.L. and N.L.,] sleep with me in my California king-size bed." *Id.* at 71. Ny.L., however, testified that "[Mother] would force us to go upstairs. So, she would lock us out of the [family] room and keep the babies in there, and be on the phone . . . . " *Id.* at 93-94. J.L. testified that he slept on the floor and did not have a choice about it, and when asked whether he slept on the couch in the family room as Mother had testified, J.L. responded, "No, [Mother] sleeps on the couch." *Id.* at 110-11. When the CUA caseworker gave J.L. an air mattress, Mother returned it to the caseworker the following week. N.T. at 64-67. The juvenile court found that Mother's testimony that she does not force Siblings to sleep on the floor to be not credible, and that Mother forced Siblings, specifically including J.L., to sleep on the floor, even after caseworkers advised Mother that bedding was a necessity for Siblings and despite Mother having the means to obtain new bedding. Trial Ct. Op. at 8, 10-11.

J.L. had missed 19 days of the 2023-2024 school year by October 23, 2023. N.T. at 18-19, 53. When the CUA caseworker asked Mother about J.L.'s absences from school, Mother stated that J.L. could walk to school. N.T. at 53-54. The DHS social worker recommended a behavioral health evaluation

for J.L. as he "often comes across very withdrawn . . . [and because] he's not attending school – just to find out what's going on with him, to see if he's willing to open up." *Id.* at 27.

It is unclear from this record whether M.L. and N.L. were themselves subject to physical abuse by Mother, but it is clear that they resided in Mother's household when frequent incidents of conflict, including incidents in which physical abuse were alleged and police intervention occurred. *Id.* at 79, 89, 95. The DHS social worker testified that she believed M.L. and N.L. would benefit from early intervention and developmental evaluations. *Id.* at 27-28.

Mother disavowed any abuse or neglectful conduct, and further asserted that she did nothing wrong. *Id.* at 107, 114-15.

There is sufficient basis in the record to conclude that Mother is incapable of managing conflicts with Siblings without resorting to extreme measures such as having them involuntarily committed to psychiatric institutions, withholding food and bedding, and calling the police to intervene in parent-child conflicts in her household. *Id.* at 8-13, 6-18, 24-25, 33, 35, 57, 59-62, 64-67, 89-90, 95-97, 111, 116. While it is unclear whether all of Mother's harmful behaviors described in the record applied to all three Children, Mother's disavowal of any problem with her management of conflict with Siblings is a prognostic factor which the juvenile court may take into account to conclude that Mother would likely apply the same treatment to Children when conflicts arise. *See R.W.J.*, 826 A.2d at 14-15.

We conclude on this record that the juvenile court was within its discretion to find that the welfare, safety, and health of Children "continues to be jeopardized due to Mother's forms of discipline[,]" that Mother is presently unable to provide Children with proper parental care and control, and that such care for Children is not immediately available. *See* 42 Pa.C.S. § 6302, *E.B.*, 83 A.3d at 430-31; *R.W.J.*, 826 A.2d at 14-15. Therefore, Mother is not entitled to relief on this issue.

## Foster Care

In her second claim, Mother challenges the juvenile court's order removing Children from Mother's care and placing Children in foster care. Specifically, Mother argues that

> [e]ven assuming J.L. had bedding insufficiency, the issue could have been corrected and the child allowed to remain in the home were a bed ordered. With regard to M.L. and N.L. absolutely no evidence was provided supporting adjudication let alone removal of [M.L. and N.L.] from the family home.

Mother's Brief at 14.[8]

_____

[8] Mother has not developed her argument for this issue beyond bald assertions, and failed to support her argument with citations to the record. *See* Mother's Brief at 14. This Court has held that "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (citations omitted); *see also Milby v. Pote*, 189 A.3d 1065, 1079 (Pa. Super. 2018) (explaining that this Court will "not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument" (citation omitted)); Pa.R.A.P. 2119(a), (c) (providing that the argument section of appellate brief shall contain discussion of issues raised
*(Footnote Continued Next Page)*

After finding a child dependent, the juvenile court may enter an order of disposition that is "best suited to the safety, protection and physical, mental, and moral welfare of the child[.]" 42 Pa.C.S. § 6351(a). In crafting such a disposition, the juvenile court should only separate a child from a parent "when necessary for [the child's] welfare, safety or health or in the interests of public safety[.]" 42 Pa.C.S. § 6301(b)(3). Before removing a dependent child from the care of a parent, the juvenile court must establish that such removal is a "clear necessity," that is, that "alternate services that would allow a child to remain with his [or her] family are unfeasible." **A.N. v. A.N.**, 39 A.3d 326, 334 (Pa. Super. 2012) (citation omitted); **see also** 42 Pa.C.S. § 6351(b). It is within the province of the juvenile court, "as fact finder, to determine whether [a child's] removal from [his/]her family was clearly necessary." **A.N.**, 39 A.3d at 331 (citation omitted).

Here Mother does not acknowledge harm to Children in withholding food and bedding as a form of discipline, and failing to provide bedding for Children even after DHS informed her that this was necessary. Mother also does not acknowledge the harm that Children experienced due to frequent parent-child conflicts that routinely result in police intervention at Mother's behest, and from Mother habitually managing such conflicts by having her children involuntarily committed to psychiatric hospitals. Mother has refused DHS's

_____

therein and citation to pertinent legal authorities and to the record). However, because we can discern Mother's argument with respect to the juvenile court's disposition of Children, we decline to find waiver in this instance.

offers of services such as domestic violence counseling and therapy to address her anger and aggression towards her children, and returned the air mattress provided to J.L. to address his lack of bedding. On this record, we find that the juvenile court had sufficient basis to conclude that alternate services that would allow Children to remain in Mother's care were unfeasible and that removal was therefore necessary for Children's welfare, safety, and health. *See* N.T. at 20-21, 67; 42 Pa.C.S. § 6351(a); *A.N.*, 39 A.3d at 331, 334. We discern no abuse of discretion by the juvenile court in entering a disposition order that removed Children from Mother's care. *See E.B.*, 83 A.3d at 430; 42 Pa.C.S. § 6351(a).

Accordingly, Mother is not entitled to relief of her claims, and we affirm the juvenile court's orders.

Orders affirmed. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/6/2024