J-A27026-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: L.D., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1476 EDA 2021 |

Appeal from the Order Entered June 30, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000544-2020

BEFORE:   PANELLA, P.J., LAZARUS, J., and DUBOW, J.

MEMORANDUM BY LAZARUS, J.:                **FILED DECEMBER 16, 2021**

T.D. (Mother) appeals from the trial court's order adjudicating her minor daughter, L.D. (Child) (born 5/18), dependent and transferring physical custody of Child from Mother to the Philadelphia Department of Human Services (DHS).  After careful review, we affirm.

On May 17, 2020, DHS received a Child Protective Services (CPS) investigation report alleging that, while in the care of Mother's boyfriend, J.R.,[1] Child, who was two-years-old at the time, sustained bruising and contusions to her face, neck, forehead, and chest, as well as an upper-lip laceration. Mother had left Child in J.R.'s care to go to the hospital after Mother had been embroiled in a physical altercation with J.R. in which he struck and choked

---

[1] One of J.R.'s friends, Johnathan, a known drug dealer, allegedly came to Mother's home and was with J.R. and Child when Mother was at the hospital.

Mother.[2]  Mother, who was 25-weeks pregnant with Child's half-sibling at the time, suffered abdominal and throat pain and was vomiting blood as a result of the assault.  Mother reported that Child witnessed the altercation and was visibly distressed by it.  When Mother returned home from the hospital five hours later, the house was in disarray and J.R. appeared to be "high."  J.R. denied that anything had happened to Child while in his care.  Child, who was upstairs in bed when Mother returned, was lying in a wet puddle and there were spots of blood on the mattress.  Child's face was very red and swollen.

The following day, after Mother ruled out an allergic reaction and the once-red areas of Child's face began to turn black and blue, Mother took Child to the emergency room at Saint Christopher's Hospital for Children in Philadelphia (St. Christopher's).  Norrell K. Atkinson, M.D., a child abuse pediatrician at Saint Christopher's, treated Child for the injuries.  Doctor Atkinson testified that the swelling to Child's forehead was the result of blunt force trauma and that the petechiae[3] bruising on Child's face, neck, and chest

_____

[2] Mother admitted that she had a history of domestic violence with J.R.  She also admitted to untreated mental health diagnoses (PTSD, major depressive disorder, bipolar disorder, and anxiety), stated that she had not taken her medications since May 19, 2019, and had not been in treatment for her mental health issues since June of 2019.  Mother also admitted that J.R. was illegally using prescription drugs.  In fact, the record contains J.R.'s criminal history summary, which includes convictions for eight drug offenses.

[3] Petechiae are red, brown, or purple spots on the skin that occur when blood vessels bleed into the skin.  ***See*** *https://www.healthline.com/health/petechiae-when-to-worry* (last visited on 11/23/21).  Child abuse involving smothering or strangulation can
*(Footnote Continued Next Page)*

could not be sustained accidentally by a two-year-old child.  The doctor also noted that the bruising was the result of a forceful compression injury indicating that Child suffered from some form of strangulation or occlusion of her airway.  Child's injuries were "unexplained" and, ultimately, determined to be "inflicted trauma/child abuse."  Final Report of Norrell K. Atkinson, M.D., 5/18/20, at 8.

CPS investigated the matter, ultimately indicating J.R. as the perpetrator of the child abuse.  On May 19, 2020, DHS filed an application for emergency protective custody, alleging Child was without proper care or control.  The court entered an order of protective custody (OPC) and placed Child in temporary kinship care with maternal great aunt.  Following a shelter care hearing held on May 20, 2020, the court found it was not in Child's best interest to return to Mother's home, granted DHS' shelter care application, lifted the OPC and transferred legal and physical custody of Child to DHS. Mother was referred to the CEU Unit for a drug screen and a dual-diagnosis assessment.[4]

On May 27, 2020, DHS filed a dependency petition.  On July 2, 2020, the dependency court entered a one-year protective order ordering that J.R.

_____

cause petechiae in the eyes and face.  Similarly, spanking, biting, and crush injuries can cause petechiae of the neck, face, and chest.  ***See*** *https://www.newhealthadvisor.org/petechiae-in-children.html*  (last visited 11/23/21).

[4] On September 2, 2020, the court appointed counsel for Mother.

"refrain from any contact[,] directly or indirectly[,] with" Child, including no telephone, verbal, third-party, eye, written, or physical contact. *See* Dependency Court Protective Order, 7/2/20.

On November 16, 2020, the trial court held a contested child abuse hearing. At the conclusion of the hearing, the court: deferred adjudication as to Child pending a paternity test for Child's putative father;[5] found Child was a victim of child abuse with J.R. as the perpetrator, *see* 23 Pa.C.S. § 6303; granted Mother weekly, supervised line-of-sight visits with Child; noted that Mother had completed parenting classes; referred Mother to Behavioral Health Services (BHS) for an evaluation; and ordered Mother to undergo a drug screen, assessment, and treatment, and receive three random test prior

---

[5] The results of the paternity test reported the probability that J.M. was Child's biological father as 99.999999 percent.

to the next listing.[6]  In January,[7] March,[8] May,[9] and June of 2021, the court held four contested adjudicatory/dispositional hearings.

Finally, on June 30, 2021, the court issued an order adjudicating Child dependent, finding that it was in Child's best interest to remove Child from Mother's home, continuing Child's kinship care with maternal great aunt, and transferring legal custody of Child from Mother to DHS.  Mother's weekly, supervised visits continued, and the placement goal remained "return to parent."  Order of Adjudication and Disposition, 6/30/21, at 2.  Finally, Mother was ordered to provide the Community Umbrella Agency (CUA) with her current address, CUA was directed to conduct an assessment on Mother's

_____

[6] After this hearing, the court also adjudicated Child's half-brother, E.R., **see infra** at 8, n.10, dependent, removed him from Mother's care and placed E.R. in DHS' custody.

[7] At the January 12, 2021 hearing, a DHS caseworker testified Mother had made "substantial progress" with regard to her single case plan objectives: find stable housing, find employment, engage in trauma-based therapy with domestic violence, seek a protection from abuse order against J.R., have supervised visits with Child, enroll in drug and alcohol and mental health therapy, and cooperate with unannounced home visits.  N.T. Adjudicatory/Dependency Hearing, 1/12/21, at 16-18.  In addition, the court ordered Mother to sign releases to a substance abuse treatment center.

[8] At the March 12, 2021 hearing, the court continued kinship care, determining it to be "best suited to the protection and physical, mental[,] and moral welfare of [C]hild."  Order, 3/12/21 at 1.

[9] At the May 11, 2021 hearing, the court continued Child's placement in kinship care, again noting that it was best suited to Child's best interests.

home and perform unscheduled visits, and Mother was to attend a drug screen and three random drug tests. *Id.*

Mother filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal, Mother presents the following issue for our review:

> Did the [c]ourt err in removing [C]hild from Mother's care where [DHS] failed to prove by clear and convincing evidence that there was a clear necessity to remove [C]hild from [M]other's care, and where there was not clear and convincing evidence that [C]hild was without proper parental care by Mother at the time of trial[?]

Appellant's Brief, at 4.

In reviewing dependency cases, this Court accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

> [However,] . . . [we are not] required . . . to accept the [trial] court's inferences or conclusions of law. The appellate court reviews for [an] abuse of discretion. In dependency proceedings the scope of review is broad.
>
> \* \* \*
>
> Although bound by the facts, the appellate court is not bound by the trial court's inferences, deductions, and conclusions therefrom; the appellate court must exercise independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate.

*In the Interest of J.M.*, 166 A.3d 408, 416 (Pa. Super. 2017) (citations omitted). *See also* 42 Pa.C.S. § 6301(b)(3).

Mother contends that the trial court erred in concluding that Child was dependent and removing Child from Mother when the evidence was not clear and convincing that Child was without proper parental care and control and that it was in Child's best interest.

The Juvenile Act defines a dependent child, in part, as:

A child who:

(1) **is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety**[,] **or welfare of the child at risk**, including evidence of the parent's, guardian's[,] or other custodian's use of alcohol or a controlled substance that places the health, safety[,] or welfare of the child at risk[.]

42 Pa.C.S. § 6302(1) (emphasis added). This Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In the Matter of C.R.S.*, 696 A.2d 840, 845 (Pa. Super. 1997).

Instantly, the trial court held three adjudicatory hearings prior to declaring Child dependent and removing Child from Mother. The purpose of an adjudicatory hearing is to determine whether the allegations contained in a dependency petition are supported by clear and convincing evidence. 42 Pa.C.S. § 6341(c); Pa.R.J.C.P. 1408. "Only after this burden is met, is the [juvenile] court permitted to proceed to the dispositional hearing, which then

permits the court to order what is necessary under the circumstances, including the removal of the dependent child from parental custody." 42 Pa.C.S. §§ 6341, 6351. It is well-established that:

> [A] a child should be removed from his/her parent's custody and placed in the custody of a state agency only upon a showing that removal is clearly necessary for the child's well-being. In addition, this [C]ourt had held that clear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with his/her family are unfeasible. It is not for the appellate court, but for the trial court as fact finder, to determine whether a child's removal from his/her family was clearly necessary.

*In Interest of K.B.*, 419 A.2d 508, 515 (Pa. Super. 1980).

The record reflects that at the time of the adjudicatory/dispositional hearings, Mother had completed domestic violence and parenting classes, was in mental health treatment, reportedly attended therapy twice a week, had moved in with a friend who was willing to accept DHS supervision in her home, and had supports identified that would assist her with Child and Child's half-brother, E.R. (born 8/20),[10] if they were returned to her care.

Dawn Rodriguez, a case management director for Turning Points for Children, testified at the June 2021 adjudicatory hearing that Mother had been

---

[10] On August 29, 2020, DHS received a report alleging that during prenatal visits, Mother had tested positive for marijuana. In November of 2020, E.R. was declared dependent, based on Mother's inability to adequately care for E.R., and was placed in the legal custody of DHS while E.R. remained in kinship care with paternal great aunt. J.R. is the biological father of E.R. In August of 2021, our Court affirmed E.R.'s adjudication of dependency. *See In the Interest of E.R.*, No. 2324 EDA 2020 (Pa. Super. filed Aug. 16, 2021) (unpublished memorandum decision).

discharged in May 2021 from drug and alcohol treatment for "noncompliance;" Rodriguez had concerns that Mother may have been using drugs other than marijuana. Rodriguez also testified that while Mother told her she planned to move into a new home, Mother had not provided CUA with an address. Finally, Rodriguez testified that she was concerned that Mother was still in a relationship with J.R., the indicated perpetrator of abuse against Child.

DHS social worker Shaylin Crayder testified that in August of 2020, Mother told her that she did not believe J.R. caused any harm to Child, despite him being indicated as the perpetrator of Child's abuse. Crayder raised concerns about the altercation that allegedly occurred between Mother and J.R., which ultimately caused Mother to vomit blood and required her to go to the hospital, leaving Child alone at home with J.R. Finally, like Rodriguez, Crayder was concerned that Mother was still in a relationship with J.R.

To support its adjudication/dependency order the court noted:

> The [c]ourt heard clear and convincing evidence from Dr. Atkinson, DHS [s]ocial [w]orkers Ms. Stephanie English and Ms. Shaylin Crayder, and CUA [c]ase [m]anager Ms. Tamara Sledge[11] that [Child]'s health and safety were at risk due to Mother's present inability to provide adequate care for [Child]. During the

_____

[11] Sledge testified at the May 11, 2021 adjudicatory/dispositional hearing that Mother had "moderately" complied with her single case plan objectives of finding employment (Mother was self-employed "making scrubs and body essentials"), housing (Mother was "living from friend-to-friend's house"), continuing to visit with Child at CUA, completing parenting classes and drug and alcohol counseling, and enrolling in domestic violence treatment. N.T. Adjudication/Dispositional Hearing, 5/11/21, at 32-35. Ms. Sledge also testified that Mother had "substantially" progressed with regard to her plan, noting that Mother has refused to give CUA the address where she was living. *Id.* at 35, 47.

hearings, DHS [i]nvestigative [s]ocial [w]orker[,] Ms. English[,] reported that Mother left [Child] in the care of [] J.R. while Mother went to the hospital following an altercation with J.R. When Mother arrived home several hours later, [Child] had suffered various injuries. Ms. English testified that DHS received a CPS report in May of 2020 regarding [Child]'s injuries that were assessed and treated by Dr. Atkinson[]. The injuries observed by Dr. Atkinson included redness, swelling, bruising, and petechiae bruises to [Child]'s face, neck[,] and chest areas, as well as swelling to the front of her scalp and a "busted lip." When Mother arrived home from the hospital, she also found [Child] lying in her bed in soiled sheets and there were blood spots on the sheets. D[octor] Atkinson stated in her assessment that the types of injuries sustained by [Child] are not the type that a child of [Child]'s age could have sustained accidentally. D[octor] Atkinson testified that[,] in her opinion[,] to a reasonable degree of medical certainty[,] [Child]'s diagnos[i]s was child physical abuse. Ms. English notes that the CPS report named [Child], as the child victim and indicated J.R. as the perpetrator of [Child]'s injuries. DHS Social Worker Ms. Crayder testified that she was assigned to investigate a GPS report in August of 2020 immediately after Mother gave birth to [Child's] sibling, E.R. Ms. Crayder testified that she was concerned because Mother did not believe J.R. caused any harm or injury to [Child] despite him being named as the perpetrator in the CPS report. Ms. Crayder also testified that she was concerned because of the altercation that occurred between Mother and J.R.[,] which led to Mother being hospitalized. Ms. Crayder further testified that she was concerned that Mother and J.R. were still in a relationship, Mother had an unstable housing status[,] and [because of] Mother's mental health history. CUA [c]ase [m]anager, Ms. Sledge[,] also testified that she was concerned with Mother still being in a relationship with J.R. and expressed concerns about Mother's ability to maintain the wellbeing of [Child,] as well as Mother's own wellbeing[,] should [Child] be returned to Mother.

After hearing the evidence presented, this Court found that DHS had met its burden of showing by clear and convincing evidence that [Child] met the definition of "dependent child" pursuant to 42 Pa.C.S.A. § 6302 and was without proper parental care. Similarly[,] such proper parental care was not immediately available due to Mother's relationship with J.R., her disbelief that J.R. was the perpetrator of [Child]'s injuries[,] and Mother's unstable housing status, substance use, and mental health

history. The testimony heard by this [c]ourt was clear and convincing that [Child]'s health and safety were at risk, and therefore [Child] was adjudicated dependent.

\*    \*    \*

[With regard to Child's continued placement in kinship care, t]his court was greatly concerned by Mother's denial and disbelief that J.R. had caused any harm or injury to [Child,] despite the evidence and that he was the named perpetrator of [Child's] injuries in the indicated CPS report.  This court was also concerned with Mother's conflicting statements about whether there was domestic violence in her relationship with J.R.  This [c]ourt heard testimony from Ms. Sledge and Ms. Crayder[,] reporting that Mother claims there were no instances of domestic violence in her relationship with J.R.[,] even though an altercation occurred between Mother and J.R. which resulted in Mother being taken to the hospital while she was pregnant.  The [c]ourt's finding of clear and convincing evidence that J.R. was the perpetrator or physical abuse of [Child,] as well as Mother's denial of J.R.'s involvement, was part of this [c]ourt's reasoning for adjudicating [Child] dependent. Additionally, this [c]ourt was concerned with Mother's housing status and Mother's drug history and alcohol use.  The [c]ourt found Mother lacked the ability to provide adequate care for [Child] should [Child] be returned to [Mother's] care.  The [c]ourt determined that a return to Mother would create a health and safety risk for [Child], and thus it would be in the best interest of [C]hild for her to remain in kinship care with [] maternal great aunt.

Trial Court Opinion, 8/20/21, at 16-17, 19.

A parent's "acts and omissions should weigh equally" in determining whether proper parental care has been exercised.  *In re R.W.J.*, 826 A.2d 10, 14 (Pa. Super. 2003).  In addition, "there exists a duty to protect the child from harm that others may inflict."  *Id.*  Prognostic evidence, such as using prior conduct to determine whether a parent may pose a safety risk, is sufficient to find a child dependent.  *Id.*   Moreover, while the fact that a

sibling has been found to be dependent is not sufficient by itself to find a child dependent, the trial court may consider the conduct toward other siblings in determining whether a parent is a safety risk or can provide proper parental care. **In re E.B.**, 83 A.3d 426, 433-34 (Pa. Super. 2013).

Instantly, Mother left Child alone at home with J.R., a known perpetrator of domestic abuse, while she went to the hospital to address injuries she sustained following her own altercation with J.R. When Mother returned from the hospital, Child was bleeding from her neck, forehead, and face. Medical evidence showed that Child had suffered non-accidental, non-self-inflicted injuries and that J.R. was indicated as the abuser. In addition, Mother admitted she had not secured stable housing at the time of the adjudicatory hearings and that she had significant mental health diagnoses interfering with her ability to properly parent Child. Based on this evidence, we conclude that the trial court did not abuse its discretion when it determined that Child was dependent.

Moreover, the testimony elicited at the three adjudicatory hearings established the clear necessity that it "would be contrary to [Child's] welfare, safety or health" for her to continue to live in Mother's home. 42 Pa.C.S. § 6351(b)(1). "[N]ecessity is established when the court has considered alternative dispositions which would allow the child to remain with his parents and determined that those alternatives to separation are unfeasible." **In the Interest of Justin S.**, 543 A.2d 1192, 1198 (Pa. Super. 1988). Finally, in order to remove a child from his or her parents a court must also find that

"reasonable efforts were made prior to the placement of [C]hild to prevent or eliminate the need for removal of [C]hild from his home[.]" 42 Pa.C.S. § 6351(b)(2).

Here, the trial court found credible the testimony from DHS social workers that Mother had denied that J.R. was the perpetrator of abuse to Child and that they were concerned that J.R. was still in Mother's life at the time of the final hearing. *See* Trial Court Opinion, 8/20/21, at 17-19. Moreover, the court placed significant weight on the fact that Mother had an unstable housing situation, had ongoing substance abuse and mental health issues, and had failed to document her engagement in mental health services. In totality, the testimony supports the conclusion that if Child continued to live in Mother's home, it "would be contrary to [Child's] welfare, safety or health." 42 Pa.C.S.A. § 6351(b)(1). Mother's inability to ensure that she could provide Child with an environment free of future violence by J.R. necessitated Child's placement and ultimate removal from Mother's home. *See* N.T. Child Abuse Hearing, 11/16/20, at 85-88 (family service worker testifying that she had concerns regarding Mother's ability to protect Child and that Mother "would not have [Child's] best interest" in mind; worker also expressed concerns about Mother's temper); *id.* at 60 (DHS social worker testifying Mother did not believe J.R. had caused any harm to Child, but that she believed J.R.'s friend may have been perpetrator). That necessity is further supported by the fact that Child's half-sibling had been declared dependent and removed from Mother's care at the time of the adjudicatory hearings. *In re E.B.*,

*supra*. Finally, the record demonstrates that DHS' efforts to prevent Child's removal and placement were more than reasonable. 42 Pa.C.S.A. § 6351(b)(2). *See In re R.J.T.*, *supra* at 1190 (we defer to juvenile court's credibility determinations absent abuse of discretion).

Order affirmed.

President Judge Panella joins this Memorandum.

Judge Dubow did not participate in the consideration or decision of this matter.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 12/16/2021*