J-A03041-25          2025 PA Super 79

| IN THE INTEREST OF: S.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: DHS | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1713 EDA 2024 |

Appeal from the Order Entered May 29, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001945-2014

| IN THE INTEREST OF: I.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: DHS | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1714 EDA 2024 |

Appeal from the Order Entered May 29, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001178-2021

BEFORE:  STABILE, J., McLAUGHLIN, J., and LANE, J.

OPINION BY LANE, J.:                                      **FILED APRIL 8, 2025**

The Philadelphia Department of Human Services ("DHS") appeals from the orders dismissing the dependency petitions filed with respect to the male child, S.D., born in June of 2014, and the female child, I.D., born in July of 2016 (collectively, "the Children").  After careful review, we reverse and remand.

The factual history leading up to the filing of the dependency petitions is as follows. On April 20, 2023, DHS received a Child Protective Services ("CPS") report alleging that nine-year-old S.D.:

> was observed with a large swollen red mark on the side of his face between his eye and his ear that day; that he originally would not state how he had sustained the bruise because he was afraid that he would get in trouble, but he had later stated that [Y.C. ("Mother")] struck him on the night of April 19, 2023, after he kicked [Mother]'s dog[,] and his sibling, [I.D.], told [Mother] what happened; that [Mother] told [S.D.] not to tell anyone about the incident; that [S.D.] receives special education services; and that [Mother] has a history of DHS involvement and previously informed DHS that how she disciplines her children at home is her own business. The report was indicated.

Dependency Petition, 7/27/23, at ¶ 5(d). On the same date that it received the CPS report, DHS:

> made a visit to [S.D.'s] and [I.D.]'s school and observed that [S.D.] had a visible bruise on his face. [S.D.] stated that he was playing with [Mother's] dog[,] and the dog tried to bite him, so he kicked the dog, then [Mother] came to the home, hit him with a belt, and punched him multiple times in the face, arms and stomach. DHS learned that [S.D.] had received ice treatment from the school nurse because he was in pain. He stated that [Mother] had threatened him not to say anything about the incident. DHS observed that [S.D.] appeared to have speech issues. [I.D.] refused to speak with DHS.

*Id*. at ¶ 5(e).

In addition, on April 20, 2023, DHS visited the address where Mother was alleged to be living and learned that she had been evicted from the premises. *Id*. at ¶ 5(g). On April 21, 2023, DHS spoke with Mother by telephone, whereupon Mother:

indicated that the family lacked stable housing and refused to provide the address of where she and the [C]hildren were staying. She stated that she was aware that DHS had spoken with the [C]hildren in school and threatened to sue DHS. [Mother] stated that the marks on [S.D.]'s face were from a bug bite. . . .

*Id*. at ¶ 5(i).

DHS again visited the Children at their school on May 12 and June 12, 2023. *Id*. at ¶ 5(n), (p). I.D. refused to speak to DHS on both occasions. *Id*. S.D. was "pacing back and forth in a panic" on DHS's visits and stated that "he is not allowed to talk to DHS." *Id*. S.D. articulated on May 12, 2023, that Mother "told him he would be placed in foster care if he talked with DHS and that he would be abused and not fed in the foster home. He recanted the earlier statements that he had made to DHS." *Id.* at ¶ 5(n).

After DHS attempted unsuccessfully to speak again with Mother, DHS filed motions seeking to compel Mother's cooperation with its investigation into abuse and/or neglect as alleged in the CPS report, and the trial court granted the motion on June 13, 2023. *See id*. at ¶ 5(o), (q).

On the same date that its motion was granted, DHS visited a different address where Mother and the Children were allegedly residing, and "were greeted" by the Children's "maternal godmother," who informed DHS that she owns the home and was allowing Mother and the Children to reside there since their eviction in April of 2023. *Id*. at ¶ 5(r). However, Mother and the Children were not present in the home when DHS visited on that date, nor when DHS visited again on June 14 and 21, 2023. *See id*. at ¶ 5(r)-(t). DHS then filed

another motion to compel Mother's cooperation with the investigation, which the court granted on June 28, 2023. On that same date, DHS again visited the godmother's home and found Mother present. *Id.* at ¶ 5(v). While DHS was at the home on June 28, 2023, Mother executed the safety plan devised by DHS. *Id*. On June 29, 2023, Mother rescinded her agreement to the safety plan, and she also refused services from the Community Umbrella Agency ("CUA"). *Id*. at ¶ 5(w).

DHS filed the petitions in July 2023, alleging that the Children are dependent as defined by section 6302 of the Juvenile Act, 42 Pa.C.S.A. § 6301-6365, and requesting that they remain with a parent or custodian and be supervised by DHS.[1] DHS alleged, in pertinent part, that the Children have not received medical care since 2019. *Id*. at ¶ 5(x). Further, DHS averred that Mother's parental rights to five of her older children were involuntarily terminated in 2014, and Mother "has a history of not cooperating with DHS'[s] investigations." *Id*. at ¶ 5(b)-(c).

The certified dockets in this case reveal that, after the dependency petitions were filed, the trial court granted eight separate requests to continue the evidentiary hearing. The hearing occurred on May 29, 2024, ten months after DHS filed the petitions, during which time the Children remained in

---

[1] DHS did **not** seek a finding that the Children are victims of "child abuse" pursuant to section 6303 of the Child Protective Services Law, 23 Pa.C.S.A. § 6303.

- 4 -

Mother's custody. The Children, then ages nine and seven, were present for the hearing and represented by a single guardian *ad litem*/child advocate ("GAL"). Mother was present and represented by counsel during the hearing, but she did not testify. In addition, S.D.'s biological father, R.C., was present and represented, but he neither testified nor sought custody of S.D. I.D.'s biological father, D.F., was likewise represented, but he did not appear and did not request custody of I.D.

DHS presented the testimony of its caseworkers, Letisha Lowery and Kelly Cush. DHS also presented the testimony of the CUA worker, Stephanie Reily, who revealed that S.D. was then attending a cyber school, and he did not have any school-based services. *See* N.T., 5/29/24, at 33. In addition, DHS requested to present the testimony of S.D. *in camera*, which the GAL joined. *See id*. at 48. However, after Mother indicated that she wanted S.D. to testify publicly, the trial court ordered that if S.D. was called as a witness, he would testify in the courtroom. *See* N.T., 5/29/24, at 48-49. DHS's counsel proceeded to call S.D., and he took the witness stand. *Id*. at 49-50. However, following S.D.'s *voir dire*, the trial court "disqualified" him from testifying after he answered "no," *inter alia*, to whether he knows what a court is. *Id*. at 49-57. Thereafter, DHS's counsel attempted to qualify S.D. as a witness, but ultimately agreed that he was not competent to testify. *Id*. at 53-57.

Finally, DHS presented documentary evidence, including (1) a photograph depicting S.D.'s bruised right cheekbone; (2) DHS's investigative report, including, but not limited to, DHS's assessment that the Children will be at risk due to the CPS "involvement;" and (3) the CPS investigation report approved by the DHS supervisor, Ms. Cush, on June 16, 2023, revealing the indicated status of the investigation and explaining:

> The outcome was delayed due to [M]other's noncompliance. A compel to cooperate petition was opened and [M]other was ordered to cooperate with the investigation. ***Mother has an extensive history of inappropriate physical discipline.*** Mother beat the child leaving bruises to the face. Mother has been combative and resistant despite being ordered by the court to cooperate.

CPS Report, at 1 (emphasis added); ***see also*** DHS Exhibits 1-3.

The trial court set forth its factual findings from the testimonial evidence, as follows.

> DHS first became aware of this family in April of 2023, when DHS received a CPS report. The report alleged that Mother was using inappropriate physical discipline/corporal punishment — hitting and punching her children. The CPS report was investigated by a DHS social worker who visited the family home and attempted to speak with the Children and Mother, but nobody was at the home. The DHS worker testified that she spoke to S.D. at his school either the same day as the CPS report or the next day. When the DHS worker asked S.D. what transpired leading to the CPS report, S.D. told the DHS social worker that he was playing with Mother's dog, he began kicking at the dog, and Mother either punched, slapped, or hit S.D. in the face to get him to stop kicking at the dog. S.D. was then asked by the DHS social worker how much the physical punishment hurt on a scale from one to ten, and the DHS social worker relayed that S.D. did not give a numerical response but stated it hurt "a lot" and he had to go to the school nurse because of the injury.

One or two days after Mother hit S.D., a DHS social worker called Mother, introduced herself, and explained DHS's role. The DHS social worker attempted to schedule a walk-through of Mother's housing situation to see if the home was suitable for the Children. However, DHS was told by Mother that she was in-between houses at the time and did not feel comfortable giving DHS her address. The DHS social worker further testified that she tried to tell Mother that the investigation/walk-through would be very quick, but Mother cut her off, stated that S.D.'s facial swelling/bruise was due to a bug bite, that her explanation should be sufficient to end the investigation, and then hung up on the DHS social worker. At that point, DHS hired a private investigator and, a short time later, the investigator found Mother at a different residence than the one provided to DHS. The family's CUA caseworker and a DHS supervisor visited the residence, and the DHS supervisor was then able to complete a walk-through of the house and determined it had no issues. Between that home visit and the May 29, 2024[,] adjudicatory hearing that is the target of DHS's instant appeal, there were over ten continuances to the case and no other allegations of abuse or mistreatment were leveled at Mother.

Trial Court Opinion, 9/26/24, at 1-3 (*citing* N.T., 5/29/24, at 11-12, 14-15, 21, 56-57) (footnotes omitted) (cleaned up).

By orders dated and entered on May 29, 2024, the trial court found the Children not dependent and dismissed the petitions. DHS timely filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The trial court thereafter authored its Rule 1925(a) opinion.

On appeal, DHS requests that we review "[w]hether the trial court erroneously failed to conduct a comprehensive and searching inquiry of the

matter when it imposed a 30-day limit on the timeliness of the evidence it would consider under the Juvenile Act?"[2]  DHS's Brief at 4.

In reviewing this issue, we are required to accept the trial court's findings of fact and credibility determinations when supported by the record. **See In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010).  The Court is not required to accept the lower court's inferences or conclusions of law and accordingly reviews for an abuse of discretion.  **See id**.

A dependency hearing is a two-stage process governed by the Juvenile Act.  The first stage requires the court to hear evidence on the dependency petition and to determine whether the child is dependent.  **See** 42 Pa.C.S.A. § 6341(a).  Section 6302, defines a "dependent child," in part, as one who:

> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals.  A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent . . . that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302(1).  This Court has held a child will be declared dependent when he is presently without proper parental care or control, and when such care and control are not immediately available.  **See In re G.T.**, 845 A.2d 870, 872 (Pa. Super. 2004).  Proper parental care has been defined as "that

---

[2] Mother filed an appellee brief, but neither of the Children's respective fathers did so.  The GAL failed to file a brief, which we deem unacceptable in this appeal from the orders dismissing the dependency petitions.

care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." ***In re A.B.***, 63 A.3d 345, 349 (Pa. Super. 2013) (internal quotation marks and citation omitted). "The question of whether a child is lacking proper parental care and control encompasses two discrete questions: whether the child presently is without proper care and control, and if so, whether such care and control is immediately available." ***In re M.W.***, 842 A.2d 425, 428 (Pa. Super. 2004) (citation omitted). In answering the first question, the paramount concern is the "welfare of the child at the time of the hearing." ***In the Interest of Black***, 417 A.2d 1178, 1183 (Pa. Super. 1980). In answering to the second question, "it may be necessary for the hearing court to look to the future." ***Id***. at 1182.

A finding that a child is dependent requires proof by "clear and convincing evidence," *i.e.*, testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts at issue." ***Matter of C.R.S.***, 696 A.2d 840, 843 (Pa. Super. 1997) (internal quotation marks and citation omitted). If the court finds a child dependent, it proceeds to the second stage of the dependency process, which requires an appropriate disposition based on the best interest of the child pursuant to section 6351 (a) and (b). ***See*** 42 Pa.C.S.A. § 6341(a), (c); ***see also In re B.S.***, 923 A.2d 517, 521 (Pa. Super. 2007).

A court in a dependency proceeding must conduct a "comprehensive and searching" inquiry into the record taking "evidence from all interested parties and also from objective, disinterested witnesses." *In the Interest of Black*, 417 A.2d at 1181-82 (internal citations omitted); *see also In re Donna H.*, 602 A.2d 1382, 1385 (stating "the utmost concern is for the children's welfare and therefore nothing short of the comprehensive and searching inquiry into the facts mandated by decisions of this court will be acceptable") (internal citations, brackets, and quotation marks omitted). This searching inquiry is necessary to ensure the trial court has a comprehensive view of the matter, is aware of all relevant concerns, and makes an informed decision. *See In re Donna H.*, 602 A.2d at 1384-85 (remanding case for rehearing where the trial court refused to allow the child advocate or counsel for the child to cross-examine witnesses or present evidence and viewed the precipitating incident in isolation rather than looking at the entire history of the case).

It is well-established that a "finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *In re E.B.*, 83 A.3d 426, 433 (Pa. Super. 2013) (citation omitted) (affirming the adjudication of dependency of an infant based on allegations the family's two older children were adjudicated dependent after physical abuse by father who was the subject of pending criminal charges). This Court has noted when dealing with

an infant, the failure to allow prognostic evidence "would preclude a child welfare agency from ever seeking to have a newborn declared a [dependent] child, no matter how unfit or incompetent the natural parents are." *Matter of DeSavage*, 360 A.2d 237, 241 (Pa. Super. 2024) (affirming adjudication of dependency based on prognostic evidence including evidence of Mother's failure to visit and learn to properly feed infant while the infant was hospitalized); *In re R.W.*, 826 A.2d 10 (Pa. Super. 2003) (affirming dependency adjudication of an infant where the adjudication was based solely on prognostic evidence concerning Mother's prior abuse and neglect of her other children). This Court has specifically stated that a rule prohibiting a court from considering prognostic evidence and compelling the court to place the child with natural parents to determine if they can render proper care "ignores the possibility that if the 'experiment' proves unsuccessful, the consequences to the child could be seriously detrimental or even fatal." *DeSavage*, 360 A.2d at 242 (emphasis added).

In this case, DHS argues that the trial court committed legal error and abused its discretion in failing to find that the Children are without proper parental care pursuant to section 6302 of the Juvenile Act and thereby dismissing its dependency petitions. Specifically, DHS asserts that the court erred by not conducting a "comprehensive and searching inquiry" into the record. DHS's Brief at 13. DHS contends that the court instead "erroneously and arbitrarily limited evidence that it would consider" to that which occurred

- 11 -

"no more than 30 days prior to the adjudicatory hearing." *Id*. In doing so, DHS argues the court "refused to consider the substance of the evidence." *Id*. at 18. Further, DHS asserts that, contrary to the court's findings, it also presented competent testimonial evidence of an incident involving S.D. that occurred within thirty days prior to the hearing, and the court abused its discretion by also failing to consider this evidence. *See* DHS's Brief at 22-23 (discussing Ms. Reily's testimony that Mother took S.D. to a Crisis Response Center ("CRC") which ultimately recommended him for services from the provider identified as Intensive Behavioral Health Services ("IBHS"), and Mother "did not respond to her efforts to assist" in obtaining these services for S.D.); *see also* N.T., 5/29/24, at 35-36, 41. DHS requests that this Court reverse the orders dismissing the dependency petitions and remand for entry of orders adjudicating the Children dependent or, alternatively, remand "for the trial court to conduct a full adjudicatory hearing to include a comprehensive inquiry into the circumstances of the matter." DHS's Brief at 27 n.1.

After careful review, we conclude that the court erred and abused its discretion in this matter. In its opinion pursuant to Rule 1925(a), the trial court acknowledged that it did not consider evidence older than thirty days from the date of the dependency hearing and concluded that its decision was proper on the basis that the evidence was not relevant. *See* Trial Court Opinion, 8/26/24, at 5. The court stated that it "reminded" the parties'

counsel during the hearing that "'dependency is a current situation' and the only evidence of potential child abuse or other dependency issues was over a year old." *Id*. at 6 (citing N.T., 5/29/24, at 28). In our view, the court failed to apply appropriate legal principles and further erred in its factual findings.

As noted above, courts in dependency cases are required to make a "comprehensive and searching" inquiry. *In the Interest of Black*, 417 A.2d at 1181. The approach should be a wholistic one. *See id*. at 1182. This Court has specifically noted the definition of a dependent child is "intended to be flexible and to encompass the myriad circumstances that may cause a child to be without proper parental care or control." *Interest of A.D.-G.*, 263 A.3d 21, 30 (Pa. Super. 2021). These circumstances "routinely" include "lack of appropriate housing" and unemployment. *Id*.

As set forth above, the trial court's factual findings, all of which are in reference to DHS's investigation of the CPS report and Ms. Lowery's testimony in support. *See* Trial Court Opinion, 8/26/24, at 1-3 (citing N.T., 5/29/24, at 11-12, 14-15, 21, 56-57). However, the court failed to apply any of those factual findings to its determination of whether the Children are without proper parental care. The court erred by failing to consider this prognostic evidence which was the basis of the CPS report from April of 2023. *See In the Interest of J.M.*, 327 A.3d 1271, 1274 (Pa. Super. 2024) (holding that "[a]n adjudication of dependency may be based on prognostic evidence — which involves predicting the child's safety, well-being, and permanency — 'and such

evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent.'") (*citing* **In re E.B.**, 83 A.3d at 433 (citation omitted)). Indeed, the evidence relating to the allegations in the CPS report are relevant to whether proper parental care of the Children is immediately available at the hands of Mother.

To the extent that the trail court also justified its failure to consider any of its factual findings based upon its speculation that Mother was appropriately disciplining S.D. "when there is a possibility that the dog could react and hurt S.D. after being provoked by the repeated kicking," such speculation is not supported by the record. Trial Court Opinion, 8/26/24, at 8. There is no testimonial evidence about the relationship between the Children and the dog and whether the dog had a history of "reacting" if provoked. The evidence instead revealed, through Ms. Lowery, that Mother inappropriately disciplined S.D. insofar as he told Ms. Lowery when questioned at school that "Mom punched him. And they broke the chair. And then his cousin came to stop Mom from punching him." N.T., 5/29/24, at 12.

Moreover, in speculating that Mother appropriately disciplined S.D. and that her motivation was proper, *i.e.*, for the dog not to hurt him, the trial court cited **Chronister ex rel. Morrison v. Brenneman**, 742 A.2d 190, 192 (Pa. Super. 1999), for the proposition that "it is not for [the court] to dictate, as a policy matter, how a parent should choose to discipline his or her child." Trial Court Opinion, 8/26/24, at 8. We deem that case wholly inapplicable to this

matter inasmuch it involved a father's appeal from a protection from abuse order issued under the Protection From Abuse Act, 23 Pa.C.S.A. §§ 6101-6122, for discipline of his daughter. It is the Juvenile Act, not the Protection From Abuse Act, that governs this matter.

In addition, in its factual findings, the trial court erroneously found that DHS "first became aware of this family in April of 2023, when DHS received a CPS report." Trial Court Opinion, 8/26/24, at 1. However, the record reflects that Ms. Cush, the DHS supervisor, testified that Mother was well-known to DHS, as follows.

Q. When you received the case, did you review the prior case history for —

A. Yes.

Q. What, if any, concerns regarding the investigation did that bring up?

A. That Mom had a lengthy history of reports with us. There was multiple valid and indicated reports.

* * * *

A. As well as multiple [termination of parental rights to her other children].

* * * *

Q. Do you know if Mother had any voluntary or involuntary terminations?

A. She had multiple.

Q. And either voluntarily or involuntarily?

A. I believe involuntary, but I'm not 100 percent sure. I'm not.

- 15 -

[Mother's counsel]: Then I move to strike then, Your Honor. It's speculative.

THE COURT: That's sustained and stricken.

N.T., 5/29/24, at 25-27.[3]

Thus, we conclude that the court erred to the extent that it failed to consider that Mother's parental rights were terminated to other children, whether voluntarily or involuntarily. This also constituted prognostic evidence and was relevant to whether proper parental care of the Children is immediately available. *See J.J. v. Children & Youth Services*, 826 A.2d 10 (Pa. Super. 2003) (affirming the order adjudicating child dependent based upon prognostic evidence that, *inter alia*, the mother voluntarily relinquished her parental rights to four older children after failing to comply with court-ordered services).

Further, the trial court erred with respect to finding that the godmother's house where Mother and the Children were then residing "had no issues." Trial Court Opinion, 8/26/24, at 3. Ms. Reily, the CUA worker, testified, as follows:

Q. Is the housing stable and appropriate at this time?

_____

[3] As mentioned above, DHS alleged in the dependency petitions that Mother's parental rights were involuntarily terminated to her five older children. *See* Dependency Petition, 7/27/23, at ¶ 5(b). In its brief, DHS asserts that it was four older children to whom her parental rights were involuntarily terminated. *See* Mother's Brief at 20. The record does not reveal the exact number of Mother's older children and to how many of them her parental rights had been terminated.

A. The housing, from what I can see, as I have not been able to do a full walk-through, is I have no concerns with . . . what I can see, which is the full living room and some of the dining room. The house is owned by [Mother]'s godmother, who I have met on a few occasions.

[Mother] had indicated that she is allowed to live there with godmom. So there is no structural concerns or no concerns with the home in that sense. But it is not a home that . . . [Mother] is on the lease for.

N.T., 5/29/24, at 36-37. Ms. Reily also testified:

Q. In speaking to Mother and the [C]hildren, what are their sleeping arrangements?

A. Sleeping arrangements are that the — Mother and the [C]hildren sleep in the basement. [S.D.] sleeps on . . . an armchair or some type of reclining chair. [I.D.] supposedly has a bed. And Mother sleeps on the floor.

*Id*. at 31. As such, the court erred in failing to consider and further inquire into Mother's housing instability and the Children's current sleeping arrangements which was relevant to whether proper parental care of the Children is immediately available. ***See In the Interest of K.B.***, ____ A.3d at ____, 2025 Pa. Super. LEXIS 41, *21 (Pa. Super. 2025) (confirming that "this Court has found casual housing arrangements where the parent does not have a lease to be unsuitable.") (citation omitted); ***see also Interest of A.D.-G.***, ***supra***.

Finally, we conclude that the court erred in failing to consider evidence of Mother's lack of cooperation with DHS and CUA throughout the investigation of the CPS report. Indeed, Ms. Lowery testified that Mother allowed neither her nor Ms. Cush to speak with the Children. ***See*** N.T., 5/29/24, at 15. Ms.

- 17 -

Cush then testified that Mother rescinded the safety plan that she had initially signed. *Id*. at 28-29. Ms. Cush testified also that Mother, in large part, did not cooperate with her request to sign releases so that DHS could gather information regarding the Children because Mother "crossed off most things on there and put an end date, which was the next court date from the time she signed. . . ." *Id*. at 24-25. Because of Mother's behavior, Ms. Reily, the CUA worker, testified that CUA was unable to confirm whether the Children's medical needs were up to date. *Id*. at 38. Ms. Reily likewise testified that Mother would not let her speak with the Children outside of her presence, which Ms. Reily found concerning because "[t]hat is typically required." *Id.* at 34.

Pennsylvania law is clear that a parent's uncooperativeness with the child welfare agency and service provider is relevant to determining whether proper parental care is immediately available. *See K.B.*, ___ A.3d at ___, 2025 Pa. Super. LEXIS 41, *22 (finding that the mother was evasive, untruthful, and uncooperative, which was "wholly sufficient to demonstrate the child was without proper parental care and no such care was immediately available.") (citing *In re A.B.*, 63 A.3d at 349; *In re M.W.*, 942 A.2d at 428; *Interest of A.D.-G.*, 263 A.3d at 30). Thus, we conclude that the court erred in failing to consider this evidence which was relevant to whether proper parental care of the Children is immediately available.

We further hold that the trial court committed legal error and abused its discretion in excluding the foregoing evidence that was more than thirty days old as untimely and irrelevant. By doing so, the court failed to apply the law that a "finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." ***In re E.B.***, 83 A.3d at 433. In addition, the court failed to make any factual findings regarding Mother's housing instability and her lack of cooperation with DHS and CUA which was an issue up through the time of the dependency hearing and, contrary to the court's belief, constituted "other dependency issues" with respect to the Children. Trial Court Opinion, 8/26/24, at 6.

Furthermore, DHS accurately asserts that it introduced testimonial evidence through Ms. Reily that, on the weekend before the hearing, Mother sent a text message to Ms. Reily informing her "that she was at the [CRC] with [S.D.] due to him not listening and provoking the younger sister, [I.D.]." N.T., 5/29/24, at 35. Ms. Reily also testified that she

> received a voicemail from the CRC that [S.D.] was there. I was able to follow up with the CRC yesterday. And then stated that he was discharged.
>
> He was not held. And that the evaluation recommended IBHS services, which typically are services in school. And he would not be able to receive those services, because he attends cyber school.

***Id***. at 36. Ms. Reily also testified that Mother told her S.D. is diagnosed with an "autism spectrum disorder," and he has behavioral issues, including that

- 19 -

he "does not stay with [Mother] when they're in a store. He will often wander off or run off out of her presence." *Id*. at 32-33. Nonetheless, Mother informed Ms. Reily that, now that S.D. is in "cyber school," he receives no school-based services and that he is on the waiting list for "ABA services."[4] *Id*. at 31, 33. Based on this evidence, DHS argues that the court abused its discretion by failing "to order a behavioral health evaluation for S.D. and thereby erred by failing to seek out evidence from disinterested witnesses . . . [such as] a psychological expert." DHS's Brief at 25 (internal quotation marks and citation omitted). We agree inasmuch as the evidence was relevant to whether proper parental care of S.D. is immediately available with Mother. Accordingly, we conclude that the trial court erred and abused its discretion in failing to consider this evidence and conduct a "comprehensive and searching" inquiry into it.

Based on the foregoing, we hold that the trial court committed legal error and abused its discretion by failing to conduct a "comprehensive and searching inquiry" into the record with respect to the dependency issues presented by DHS, including, but not limited to, the prognostic evidence in the case. Therefore, we reverse the trial court's orders dismissing the dependency petitions and remand for the trial court to conduct a new and

_____

[4] What treatment services "ABA" encompasses is not explored in the record.

complete adjudicatory hearing consistent with this opinion following its receipt of the certified record, which is to be remitted immediately to the trial court.

Orders reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/8/2025